Revised March 15, 2000

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 98-10638

---

ALLEN BREAUX AND JOE AMBROGIO,

                    Plaintiffs-Appellees/Appellants,

                    v.

CITY OF GARLAND, ET AL,

                                        Defendants,

        CITY OF GARLAND,

                                        Defendant-Appellee,

TERRY HENSLEY AND RON HOLIFIELD

                                        Defendants-Appellants.

---

Appeals from the United States District Court for the
Northern District of Texas

---

February 23, 2000

Before JONES and WIENER, Circuit Judges, and WALTER*, District
Judge.

EDITH H. JONES, Circuit Judge:

---

        *  District Judge of the Western District of Louisiana, sitting by
designation.

This case involves the First Amendment retaliation claims of two police officers against the City of Garland ("City"), its former Police Chief, and its former City Manager. Officers Allen Breaux and Joe Ambrogio (the "Plaintiffs") argue that Terry Hensley and Ron Holifield (the "individual Defendants"), and later the City, violated 42 U.S.C. § 1983 by retaliating against the Plaintiffs for making public allegations of corruption in the Garland Police Department.

The jury found the individual Defendants liable, and even after a large remittitur was accepted by the Plaintiffs, the district court entered judgment exceeding $8 million, plus attorneys' fees, for the Plaintiffs. Both sides have appealed. We conclude that the judgment is fatally flawed because the Plaintiffs failed to prove that official retaliation against them was sufficiently serious to constitute a constitutional injury. No other reversible error has been raised.

## I. FACTUAL BACKGROUND

This case is factually complex, as evidenced by the parties' continuing disagreement about what happened in the City of Garland and the Garland Police Department between 1992 and 1994. The following review of the facts is guided by the jury verdict favoring Breaux and Ambrogio. In the beginning of 1992, the City hired Holifield as its City Manager. The Garland City Council instructed Holifield to hire a new police chief from outside the

2

department. Holifield ultimately hired Hensley, who started working for the City in April 1992. During the summer of 1992, Hensley contacted the FBI's Dallas office to discuss possible land acquisitions and flips made by members of the City administration.

In October 1992, Hensley met FBI Agent Largent, the supervisor of the white collar crime squad for public corruption, to discuss the land deals over lunch. Two other Garland police officers, Jody Lay ("Lay") and Larry Wilson ("Wilson"), were present at this meeting. During the conversation, it became clear that the FBI was beginning to investigate the possible involvement of some current and former council members in two City of Garland real estate transactions. According to Wilson, Hensley conducted the meeting and told the FBI agent who and what Hensley wanted investigated. The subjects included former Garland mayor Billy Earl Tomlinson ("Tomlinson"); former City Councilman James Ratliff ("Ratliff"); and Garland Councilman Vernon Gaston ("Gaston").[1] Lay continued to assist the FBI until late 1992 when Officer Joe Harn ("Harn") took over for Lay. The FBI initiated a second investigation concerning possible Garland public corruption in relation to a landfill deal between the City and Waste Management,

---

[1] According to the Plaintiffs, Ratliff, Gaston, and Tomlinson were all close friends and political allies. Wilson was also a good friend of Tomlinson. The Plaintiffs contend that Hensley instructed the FBI to investigate these individuals because they were "political enemies" of Hensley. The Plaintiffs also assert that Holifield played a significant role in the FBI investigation by acting as a "confidential informant" for the FBI. Holifield participated in the investigation at the request of the FBI, before he made the statements that serve as the basis for the Plaintiffs' § 1983 claim.

Inc., which was allegedly brokered by Ratliff and Gaston.

During the summer of 1992, Hensley put Lay in charge of the Intelligence Unit of the Department. Hensley told Lay that he was concerned about the current direction of the Unit as well as the performance of the two officers in the Unit. Hensley was particularly concerned with Breaux, who Hensley thought devoted too much of his time to Asian gangs. Lay apparently shared these concerns; in a September 11, 1992, memo to Hensley, Lay requested that Breaux be transferred out of the Intelligence Unit.

Breaux was then a 20-year veteran officer. Officer Breaux testified that he asked to be transferred back to patrol duty after Lay informed him, during a truck ride in the country, that Hensley and Lay "were redirectionalizing the Intelligence Unit to start doing political investigations for Charlie Hinton, the city attorney, and members of the city council."[2] Breaux was unwilling to engage in "political investigations" instituted by the new police chief. Although Breaux contemporaneously reported his conversation with Lay to Lieutenant David Swavey, he did not otherwise pursue the matter.

After being transferred out of the Intelligence Unit, Breaux remained on patrol duty until late 1993. In November 1993, Breaux received a poor performance review from his supervisor and

---

[2]     Lay contends that he went with Breaux to discuss Lay's recommendation in the memo. Lay maintains that during the ride he said only that the Unit would handle "high level 'public corruption' cases;" Lay denies any discussion of political investigations.

4

was assigned to front desk duty at the Department.[3]

In the Spring of 1994, Officer Breaux, newly-elected vice-president of the Garland Police Officers Association ("GPOA"), told Detective Ambrogio, the GPOA president, about the previous attempt to recruit him for political investigations. Shortly thereafter, the GPOA conducted a survey of all Department employees to identify morale problems and to determine how to overcome any such problems. Upon learning of the survey, Chief Hensley became very upset and upbraided Ambrogio about it.

In March 1994, Holifield met with the GPOA Board to discuss the survey. During this meeting, Breaux first revealed to the City Manager the alleged illegal political investigations being run by Chief Hensley. Breaux also told Holifield that the station was wired so that a former police chief could monitor any telephone conversation in the building. The GPOA Board members were concerned that someone might try to monitor their calls after the results of the survey were published. After Breaux mentioned the alleged investigations, Holifield immediately ordered that any ongoing investigations were to remain confidential. Holifield also expressed his concern with GPOA tactics and allegedly threatened to "destroy" the GPOA if it acted "politically" with respect to these allegations or the survey results. But Holifield offered to work

---

[3]     Breaux's supervisor reported that Breaux would not adequately enforce traffic laws because Breaux questioned the legality of (1) requiring people to have driver's licenses and (2) confiscating weapons.

5

with the GPOA if the GPOA would keep politics out of the Department. With the apparent approval of Breaux and Ambrogio, Holifield agreed to investigate the GPOA allegations. Toward this end, Holifield reported the allegations to Hensley.

At this point, the retaliation began. Hensley informed Lay of the allegations of politically motivated investigations, and Hensley brought an Internal Affairs charge, investigation I/A 94-12, against Breaux for making false statements -- about the investigations.

Soon thereafter, Holifield discovered that film was missing from a secret camera, which had been installed in his office to catch suspected intruders. Realizing that police officers would recognize the hidden camera and knowing that the GPOA Board had been in his office for the March 1994 meeting, Holifield told Hensley about the missing film. Hensley initiated Internal Affairs investigation I/A 94-13 against all the GPOA Board members to determine if they had stolen the film.[4]

Detective Ambrogio, on the advice of a lawyer from the Combined Law Enforcement Association of Texas ("CLEAT"), then held a press conference, where he, the lawyer, and a City Councilman who was one of the targets of the alleged investigations, made

---

[4] After the March 1994 meeting in Holifield's office, Gaston admitted that someone had told him about the hidden camera, but Gaston refused to identify who it was. The investigation of all the officers present was narrowed to an investigation of Ambrogio for interfering with an investigation and revealing confidential information. Although the ensuing investigation failed to determine who stole the film, Ambrogio later admitted that he had made the unauthorized disclosure to Gaston.

expansive allegations about illegal political investigations being conducted by Hensley and Holifield.[5] Relying on statements made by Breaux during the meeting in Holifield's office, Ambrogio and the others also alleged that the Department was conducting electronic surveillance of its employees since the phones in the Department were bugged. The CLEAT attorney, Bob Hasty, went so far as to inquire whether there is "in fact, a Gestapo type of ... secret intelligence organization that is doing political investigations of police officers."[6] Hasty further propagated Breaux's allegations in letters to law enforcement authorities in the state. These public statements led to another Internal Affairs investigation, I/A 94-14, which focused on Ambrogio's possible violation of several General Orders of the police department. Investigators recommended that the charges in 94-14 be sustained and the Chain of Command Board agreed.

As part of the investigations, Breaux and Ambrogio were both questioned on several occasions, and Breaux was required to take a polygraph administered by the Department. The Internal Affairs investigations concluded that Breaux and Ambrogio had lied

---

[5] Ambrogio first received notice that he would be questioned in I/A 94-13 on April 18, 1994. After consulting with the CLEAT attorney, Ambrogio called the GPOA press conference on April 20, 1994.

[6] During the press conference, CLEAT and the GPOA requested an external investigation into the Department's activities. The Texas Rangers investigated Hensley's conduct in May 1994 and reported "a complete lack of evidence of wrongdoing on the part of Chief Hensley or his staff." At the request of Ratliff, the FBI also investigated Hensley's conduct. The FBI reached the same conclusion as the Texas Rangers.

7

in making their allegations of corruption. Hensley publicly posted the results of the investigations in the Department and made the results available to several local media outlets, leading everyone in the department to know the Plaintiffs were "in trouble." Breaux was also required to undergo a psychiatric exam following comments he made to another officer while *en route* to the Department polygraph test.[7]

Following the various interviews, Internal Affairs investigations, and polygraphs, Breaux was placed on paid administrative leave. In May 1994, Hensley called each Plaintiff into his office separately, telling each that he could keep his job if he accepted a short suspension and signed a letter, the terms of which were to be mutually agreed to, retracting all of his allegations. Both men refused the agreement offered by Hensley. Hensley took no further action with respect to Breaux and Ambrogio.

Later in May, Ratliff was elected mayor of Garland. An ally of those whom Hensley had been investigating, Ratliff caused both Chief Hensley and City Manager Holifield to resign. In the few months following Hensley's resignation, the new Acting Police Chief Barnett "non-sustained" the Internal Affairs charges against Breaux and Ambrogio. Nevertheless, after returning from his paid administrative leave in July 1994, Breaux was assigned to the Telephone Response Unit ("TRU"). Breaux contends that Lay was a

---

[7]     Breaux told the officer that Breaux was surprised that someone had not already shot an Internal Affairs investigator between the eyes.

friend of Barnett's and that Barnett thought Breaux should be punished with this assignment. (According to the City, Breaux was assigned to the TRU, a position similar to the one he had at the front desk, in order to accommodate his shift preferences.) Breaux subsequently wrote to Barnett complaining about his assignment to the TRU and requesting a transfer back to patrol duty. Chief Barnett granted Breaux's request, and Breaux returned to patrol duty in November 1994.

Neither Breaux nor Ambrogio suffered a reduction in pay. Both remain employed by the City of Garland.

## II. PROCEDURAL HISTORY

In October 1994, Breaux and Ambrogio filed suit against the City, Holifield, and Hensley alleging that the defendants were liable under 42 U.S.C. § 1983 for violating the Plaintiffs' constitutional rights to free speech and free association. Breaux also alleged that the City violated the Texas Whistleblower Act, Tex. Gov't Code Ann. § 544.001, et seq., by retaliating against him for reporting wrongdoing involving Holifield and Hensley. The case was removed from state to federal court.

Responding to serial motions for summary judgment by the City, the district court first held that the statute of limitations barred all of the Whistleblower Act claims except for Breaux's claim that his assignment to the TRU in July 1994 was in retaliation for reporting possible political investigations.

9

Later, the district court granted summary judgment on the Plaintiffs' § 1983 claim against the City on the ground that Hensley and Holifield did not have "final policy-making authority" for the City with respect to "police officer employment decisions."

After a seven-day trial, the jury found Hensley and Holifield individually liable under § 1983, ordering actual damages against each defendant for each Plaintiff in amounts exceeding a half million dollars. Each individual Defendant was also ordered to pay $5,000,000 in punitive damages to each Plaintiff. The City was found liable to Breaux under the Whistleblower Act for $527,500 in actual damages and $5,000,000 in punitive damages. The total award to both Plaintiffs amounted to $27,707,012.

The court entered judgment on the verdict but then responded to various post-judgment motions. The district court granted the City's Motion for Judgment as a Matter of Law on the Whistleblower Act claim, holding that Breaux had failed to exhaust his administrative remedies. The court also found that the jury's findings of lost earning capacity and part of the award to Breaux for lost past income were not supported by the evidence. The court accordingly reduced the actual damages, proportionally reduced the punitive damages, and required a remittitur from the Plaintiffs. The Plaintiffs accepted the remittitur. As a result, Breaux and Ambrogio were awarded, jointly and severally from the Defendants, $6,258.75 and $2,256 respectively for past lost income, and severally from each defendant $150,000 for lost reputation, $50,000

10

for mental anguish, and $2,000,000 as punitive damages. The Amended Judgment dismissed Plaintiffs' claims against the City with prejudice and awarded total damages in the amount of $4,406,258.75 to Breaux and $4,402,256 to Ambrogio, plus post-judgment interest, reasonable attorneys' fees, and expenses and costs.

Hensley and Holifield contend on appeal that (1) the Plaintiffs' speech is false or reckless as to its truth or falsity and therefore not constitutionally protected (or at least they reasonably could have believed it was unprotected), (2) neither Plaintiff suffered an adverse employment action, and (3) the damages are excessive. Breaux contends on cross-appeal that he did properly exhaust his administrative remedies as required by the Whistleblower Act.[8]

### III.   ANALYSIS

**A.   Chief Hensley**

The jury was persuaded that Breaux and Ambrogio became the objects of a vendetta by Chief Hensley and City Manager Holifield, once they blew the whistle on politically-motivated investigations of Garland City Council members by the City's top employees. No doubt the jury was powerfully influenced by the corroborating testimony of Wilson and Ratliff, who (in the wake of the officers' allegations) had become Chief of Police and Mayor,

---

[8]   Other issues have been raised by the parties. We have considered them and conclude they are either meritless or subsumed by the dispositive issues.

11

respectively.

This finding is, however, not the end of the matter.  In order to establish a constitutional claim for retaliation against the exercise of one's First Amendment rights, four elements must be shown:

> First, the Plaintiffs must suffer an adverse employment decision.  Second, the Plaintiffs' speech must involve a matter of public concern.  Third, the Plaintiffs' interest in commenting on matters of public concern must outweigh the Defendants' interest in promoting efficiency.  Fourth, the Plaintiffs' speech must have motivated the Defendants' action.

Harris v. Victoria Indep. Sch. Dist., 168 F.3d 216, 220 (5th Cir. 1999) (citations omitted).

A major dispute between the parties throughout this litigation has persisted over whether Plaintiffs' allegations of corrupt political investigations by Hensley and Holifield were false, and if so, whether false or reckless allegations merit First Amendment protection.  This complaint is answered on one level by the precise wording of the jury charge.  In arriving at a verdict for the Plaintiffs, the jury was required by the court's charge to find the Plaintiffs' allegations true.[9]

---

[9] More problematic is that the court also submitted to the jury the critical second and third elements of the retaliation claim.  The second and third elements of the test outlined above examine whether a public employee's speech deserves First Amendment protection by balancing the nature of the speech, i.e. its relation to matters of public rather than purely personal concern, against the need of government entities as employers to maintain a harmonious, efficient workplace.  Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684 (1983).  District courts in this circuit have been predisposed to submit claims in this fashion, but, insofar as the second and third elements are questions of law, this

12

Hensley and Holifield nevertheless continue to label the allegations bogus and to assert that false allegations of corruption are constitutionally unprotected, but neither they nor their opponents address what standard of review we must employ concerning the jury verdict. In this circuit, several opinions refused to determine the standard of review because of uncertainty as to whether First Amendment rights raise a legal question or a mixed question of law and fact. *See* Brady, 145 F.3d at 708 n.7 (citing cases). In one recent case, however, this court cited a *de novo* standard for First Amendment claims and then reversed a jury verdict favoring retaliation plaintiffs. Harrington, 118 F.3d at 365. As Harrington assumed *arguendo* that plaintiffs' speech was entitled to First Amendment protection, the offhand invocation of a *de novo* standard of review made no difference on that issue.

Like its predecessors, this opinion will not have to resolve the uncertainty over the standard of review, and the issue may be deferred again for a future panel. As in Harrington, we assume *arguendo* that the evidence supports the jury's finding that the Plaintiffs reported truthful allegations of public corruption in the police department. Truthful allegations of such a nature

---

court has expressed its concern about the practice. *See* Brady v. Fort Bend County, 145 F.3d 691, 708 n.7 (5th Cir. 1998).

13

implicate matters of public concern.[10]   The only question then remaining is whether Officers Breaux and Ambrogio suffered adverse employment actions after the March 1994 meeting with Holifield and the subsequent press conference when they spoke out.[11]   Harrington, 118 F.3d at 365.[12]

Fifth Circuit caselaw, some of which post-dates the trial in this case, is inconsistent with Breaux's and Ambrogio's contention that they suffered actionable adverse employment actions.   "Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands."  Pierce v. Texas Dep't of Criminal Justice, Institutional Div., 37 F.3d 1146, 1149 (5th Cir. 1994).   Transfers can constitute adverse employment

---

[10]   If the allegations of corruption are true, such allegations are matters of public concern and outweigh the government's interest in efficiency. See Teague v. City of Flower Mound, 179 F.3d 377, 381 (5th Cir. 1999); Brawner v. City of Richardson, 855 F.2d 187, 191-92 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department." (footnotes omitted)).

[11]   Defendants do not contest the fourth element of the retaliation claim identified in Harris.  They acknowledge that Breaux and Ambrogio were subjected to various disciplinary actions because of their explosive allegations.

[12]   The jury found that Plaintiffs were retaliated against for exercising their First Amendment rights of free speech and association.   This court's analysis  focuses on the Plaintiffs' freedom of speech claims but applies equally to the freedom of association claims: "When a plaintiff's claims arise under both freedom of speech and freedom of association, as in the case at bar, the freedom of association claims are analyzed under the same Pickering balance test used to determine the success of the freedom of speech claims."  Anderson v. Pasadena Indep. Sch. Dist., 184 F.3d 439, 444 (5th Cir. 1999).   In this circuit, Harris sets out the requirements for First Amendment retaliation claims generally.   The only difference between the requirements for a retaliation claim predicated on free speech and one predicated on free association is that the latter "is not subject to the threshold public concern requirement."  Boddie v. City of Columbus, Mississippi, 989 F.2d 745, 747 (5th Cir. 1993).   As a result, the Plaintiffs' freedom of association claims fail for the same reason as their freedom of speech claims, namely the absence of an adverse employment action.

14

actions if they are sufficiently punitive, *see id*. at 1150, or if the new job is markedly less prestigious and less interesting than the old one, *see* Click v. Copeland, 970 F.2d 106, 110 (5th Cir. 1992).  This court has "declined to expand the list of actionable actions, noting that some things are not actionable even though they have the effect of chilling the exercise of free speech." Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir. 1998)(citing Pierce, 37 F.3d at 1150).  The reason for not expanding the list of adverse employment actions is to ensure that § 1983 does not enmesh federal courts in "relatively trivial matters."  Dorsett v. Board of Trustees, 940 F.2d 121, 123 (5th Cir. 1991).  For example, in the education context, this court has held that "'decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures,' while extremely important to the person who dedicated his or her life to teaching, do not rise to the level of a constitutional deprivation."  Harrington, 118 F.3d at 365 (quoting Dorsett, 940 F.2d at 123).

Given the narrow view of what constitutes an adverse employment action, this court has held that the following are *not* adverse employment actions: (1) mere accusations or criticism, *see* Harrington, 118 F.3d at 366; (2) investigations, *see* Pierce, 37 F.3d at 1150; (3) psychological testing, *see* Benningfield, 157 F.3d at 376; (4) false accusations, *see* Colson v. Grohman, 174 F.3d 498,

15

511 (5th Cir. 1999); and (5) polygraph examinations that do not have adverse results for the plaintiff, *see* Pierce, 37 F.3d at 1150.

The foregoing legal framework makes clear why Breaux and Ambrogio have not suffered any adverse employment actions. Hensley ordered Internal Affairs investigations of Breaux and Ambrogio after they made allegations of illegal political investigations, but, as Pierce and Colson hold, investigating alleged violations of departmental policies and making purportedly false accusations are not adverse employment actions. *See* Pierce, 37 F.3d at 1150; Colson, 174 F.3d at 511; *see also* Benningfield, 157 F.3d at 376. Hensley's requiring Breaux to undergo a psychological exam after Breaux's intemperate remark to a fellow employee also is not an adverse employment action. *See* Benningfield, 157 F.3d at 376. Although Breaux was placed on administrative leave from late April to July 1994, Breaux was paid while on leave and returned to his pre-leave position.[13] Thus, Breaux suffered no adverse action with respect to the leave. *See* Benningfield, 157 F.3d at 378 (plaintiff did not suffer adverse employment action when promotion was delayed two years in response to her exercising her free speech rights because she eventually received the promotion with retroactive pay and seniority). Similarly, any criticism, such as Hensley's oral

_____

[13] Breaux did not allege that his initial transfer out of the Intelligence Unit, made at his request, or his assignment to desk duty in November 1993 were retaliatory. It was not until March, 1994 that he first exercised his free speech rights by publicly alleging corruption.

16

threats or abusive remarks, does not rise to the level of an adverse employment action. *See* Harrington, 118 F.3d at 366.

More troubling are Chief Hensley's public posting of the findings of the Internal Affairs investigation and his attempt to get Breaux and Ambrogio to sign resignation letters. Although posting the results of the Internal Affairs investigation in the station may have comported with Departmental regulations, Hensley's disseminating that information to the media went "several steps beyond a criticism or accusation and even beyond a mere investigation" and was "punitive in a way that mere criticisms, accusations, and investigations are not." Colson, 174 F.3d at 512 n.7. The reprimands went, at least temporarily, on Breaux's and Ambrogio's permanent records.

However, this court recognizes that a rescinded reprimand does not rise to the level of an adverse employment action: "[if] the reprimand was rescinded through internal [Houston Police Department] procedures ... [it] does not constitute an adverse employment action." Benningfield, 157 F.3d at 377. After becoming Chief of Police, Barnett "non-sustained" the charges against Breaux and Ambrogio. The Plaintiffs contend that "an after-the-fact, unpublicized correction could not and did not undo the injury that Hensley's earlier reprimand caused." But the record does not indicate what employment injury the Plaintiffs have suffered. Breaux and Ambrogio are in a position similar to that of the law

17

professors in <u>Harrington</u>. *See* <u>Harrington</u>, 118 F.3d at 366. Neither Plaintiff has been discharged from the Garland Police Department. Neither Plaintiff has been demoted, denied a promotion, suffered a reduction in pay, or lost seniority as a result of his speech. In fact, the only parties to the present suit who have lost their jobs are Hensley and Holifield. Thus, Chief Barnett's non-sustaining the charges through internal procedures precluded an adverse employment result.[14]

The Plaintiffs also contend that Hensley's attempts to get them to recant their allegations constitute threats of discharge which, under <u>Harrington</u> and <u>Click</u>, are adverse employment actions.[15] However, <u>Harrington</u> and <u>Click</u> do not establish that a threat of discharge is itself sufficient to establish an adverse employment action. In summarizing the evidence, the <u>Harrington</u> court said only that "the evidence is clear that no Plaintiff has

---

[14]    The Plaintiffs' concern with the publication of the Internal Affairs investigations to the media suggests that they want to import defamation into the adverse employment prong of their retaliation claim. But the Plaintiffs have not made a defamation claim, nor is defamation part of the present § 1983 action. Furthermore, this court has recognized that "[w]hen an employee retains his position even after being defamed by a public official, the only claim of stigma he has derives from the injury to his reputation, an interest that [<u>Paul v. Davis</u>, 424 U.S. 693, 96 S.Ct. 1155 (1976),] reveals does not rise to the level of" a Fourteenth Amendment violation. <u>Moore v. Otero</u>, 557 F.2d 435, 437-38 (5th Cir. 1977). Stigma by itself, without an impact on one's employment, does not constitute an adverse employment action. *See* <u>Blackburn v. City of Marshall</u>, 42 F.3d 925 (5th Cir. 1995) ("We have applied the holding of <u>Paul</u> by requiring a section 1983 plaintiff to show stigma plus an infringement of some other interest." (citation omitted)).

[15]    The other verbal criticisms that the Plaintiffs allege took place at the chain of command board hearings are not adverse employment actions. *See* <u>Harrington</u>, 118 F.3d at 366 ("mere criticisms do not give rise to a constitutional deprivation for purposes of the First Amendment.").

18

been discharged or threatened with discharge...." 118 F.3d at 366. Not only was the court not defining the requirements for making out a successful retaliation claim under § 1983, but the court was explaining that the plaintiffs' retaliation claims must fail because the plaintiffs suffered no adverse consequences for exercising their speech rights.

In Click, the court principally discussed whether transfers that were effectively demotions, as opposed to threats of discharge, were actionable. As the Click court stated, the government "'*may not deny a benefit* to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech.'" 970 F.2d at 109 (quoting Perry v. Sinderman, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697 (1972)) (emphasis added). Some benefit must be denied or some negative consequence must impinge on the Plaintiff's employment before a threat of discharge is actionable.[16]

Click also stated that "even the threat of discharge can be a potent means of chilling the exercise of constitutional rights." Click, 970 F.2d at 109. For this purpose, Click referred

---

[16] *See also* Bickel v. Burkhart, 632 F.2d 1251, 1255 n.6 (5th Cir. 1980) ("impermissible retaliation [need] not result in the termination of his employment" in order to be actionable under § 1983, but the employer's actions must alter "important conditions of employment") (emphasis added). The record does not demonstrate that the alleged threat of discharge altered any important conditions of the Plaintiffs' employment. Hensley took no further action with respect to either Plaintiff after the Plaintiffs refused to sign the letters of retraction. Breaux was already suspended with pay, and the Internal Affairs investigations had already been completed. *Compare* Fyfe v. Curlee, 902 F.2d 401, 404-05 (5th Cir.) (transfer without loss in pay to menial, undemanding job is actionable under § 1983), cert. denied, 111 S.Ct. 346 (1990).

19

to the Supreme Court's analysis in <u>Pickering v. Bd. of Educ</u>., 391 U.S. 563, 574, 88 S.Ct. 1731, 1737 (1968). <u>Pickering</u> does not, however, state that a threat of discharge alone will suffice for a First Amendment retaliation claim. The facts before the Court involved not a threat, but the actual dismissal of a teacher for writing a letter to a newspaper critical of the local school board. In the statement quoted above by <u>Click</u>, the Supreme Court was comparing dismissals of public employees with criminal sanctions and damage awards for defamation, two other devices that had been used to penalize the exercise of free speech rights -- before the Supreme Court outlawed them.[17] Had the Court not spoken in <u>Pickering</u>, and prevented retaliatory dismissals for exercise of First Amendment rights, threats of dismissals could chill constitutional rights because they could be backed up. As the law stands now, retaliatory threats are just hot air unless the public employer is willing to endure a lawsuit over a termination. <u>Pickering</u>'s (and by extension, <u>Click</u>'s) reference to threats of termination illustrated the problem if threats could be realized; the Court did not hold or imply that threats of termination alone, in a post-<u>Pickering</u> world in which retaliatory discharge is outlawed, would generate liability.

Breaux contends that his transfer to the Telephone

---

[17]   The Court ultimately declined fully to equate employee dismissals with constitutional rights in defamation cases, precisely because in the former, a balance must be maintained between the public interest in an orderly workplace and the discussion of issues of public concern.

Response Unit ("TRU") was similar to the transfer that was found in Click to be an adverse employment action. Although initially compelling, this argument is without merit on a closer look at the record. First, Breaux was assigned to the TRU by Barnett only after Hensley had been fired. The record does not show that Hensley caused Breaux to be transferred. Second, since Breaux was already on front desk duty, the transfer did not constitute a punitive action by the department. Although Breaux felt that the TRU was a step down, "'a plaintiff's subjective perception that a demotion has occurred is not enough' to constitute an adverse employment decision." Harris, 168 F.3d at 221 (quoting Forsyth v. City of Dallas, 91 F.3d 769, 774 (5th Cir. 1996)). At trial, Chief Wilson, the Plaintiffs' first witness, testified that the TRU assignment is not viewed as punishment in the Garland Police Department and that the TRU carries out an important function within the Department. Thus, since the transfer is not traceable to Hensley and is a position similar to front desk duty, the transfer does not constitute an adverse employment action.

Finally, the Plaintiffs argue that, even if the individual actions taken by Hensley do not constitute an adverse employment action, the aggregate of these actions constitutes a "vengeful vendetta" actionable under § 1983. For this idea, the Plaintiffs cite only Thompson v. City of Starkville, 901 F.2d 456 (5th Cir. 1990), which observed: "Although it may be difficult to delimit exactly what conduct, in the abstract, violates a public

21

employee's first amendment rights, a vengeful vendetta seeking an employee's job because of his speech on a matter of public concern surely falls within the ambit." *Id*. at 470. But Thompson is not as broad as the Plaintiffs suggest. The constituent acts and the final result of the vendetta were worse than most of the alleged retaliatory actions by Hensley: The defendants accused the plaintiff police officer of committing a burglary, alleged that he threatened another officer, caused the plaintiff to be disciplined more severely than other officers for the same offense, and ultimately were instrumental in having him fired. *See id*. at 469.

Thompson is thus consistent with this court's holding in Colson. In Colson, this court evaluated when a campaign of retaliatory harassment amounted to an adverse employment action. To be actionable, "the campaign of retaliatory harassment [must] rise to such a level as to constitute a constructive adverse employment action." *Id*. at 514. The court explained "constructive adverse employment action" by reference to two cases. The court held that in Sharp the plaintiff was "constructively demoted ... because the defendants created an 'intolerable situation' causing her to transfer to a less desirable position." *Id*. (quoting Sharp v. City of Houston, 164 F.3d 923, 934 (5th Cir. 1999)). The Colson Court also relied upon Benningfield. 174 F.3d at 513. Although one plaintiff in Benningfield resigned as a result of a campaign of harassment, the court held that a reasonable person in her position

22

would not have felt compelled to resign.  Since Breaux and Ambrogio still have their jobs with the Department and have neither been demoted nor transferred to less desirable positions, they have failed to show that the Defendants' actions amounted to a constructive or actual adverse employment action.

## B.  City Manager Holifield

Despite Holifield's limited interaction with the Plaintiffs, the jury found Holifield liable under § 1983 for over $4 million in damages.  On appeal, Holifield argues that there was insufficient evidence to show that, as required by the language of § 1983, he "cause[d]" the Plaintiffs to be subjected to First Amendment violations.  As noted, whether the Plaintiffs alleged any adverse employment actions by Holifield is a question of law reviewed *de novo*.  *See* Harrington, 118 F.3d at 365.

In "assessing an individual supervisor's liability under § 1983," this circuit applies the City of Canton standard of municipal liability.  Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 453 (5th Cir. 1994)(en banc).  Under this standard, a supervisor is liable under § 1983 only if (1) his conduct directly causes a constitutional violation or (2) the plaintiffs can show that the supervisor was "deliberately indifferent" to a violation of a constitutional right.  *Id*. at 454 n.8. (citing City of Canton, 489 U.S. 378, 388 n.8, 109 S.Ct. 1197, 1204 n.8 (1989)).

Holifield did not cause the Plaintiffs to suffer a

violation of their First Amendment rights.  His direct contact with the Plaintiffs was limited.  During the March 1994 meeting with the GPOA Board members, Holifield threatened to "destroy" the GPOA if the group acted politically within the department.  With the assent of Breaux and Ambrogio, Holifield referred Breaux's allegations of politically-inspired investigations to Hensley.  Holifield also notified Hensley that film was missing from the hidden camera in his office and suggested that one of the GPOA Board members, who had recently met with him there and could recognize the camera, might have stolen the film.

Internal Affairs investigations were commenced with respect to Breaux's allegations of corruption and the missing film.  But, since neither of these investigations constitutes an adverse employment action, *see* Benningfield, 157 F.3d at 376, Holifield's role in initiating the investigations is not a sufficient "cause" to establish liability under § 1983.  *See* Heil v. Santoro, 147 F.3d 103, 110 (2d Cir. 1998) ("There being no First Amendment violation in investigating, the reason for the investigation created no material issue to be tried.").  Similarly, Holifield's criticism of and threat to destroy the GPOA are not adverse employment actions. *See* Harrington, 118 F.3d at 366.

The result is the same if Holifield's conduct is viewed from the perspective of his supervisory role.  Liability is imposed only if he was deliberately indifferent to subordinates' violations

24

of the Plaintiffs' constitutional rights. Laying aside the question whether the city manager was a supervisor of anyone in the Police Department, the fact that Plaintiffs' First Amendment rights were not actually infringed exonerates Holifield from supervisory liability.

## C.   The City of Garland

### 1.   Breaux's appeal

Breaux appeals the district court's summary judgment on his § 1983 claim against the City and post-verdict judgment as a matter of law on his Whistleblower Act claim. The district court granted summary judgment to the City on all § 1983 claims, holding that no injury was caused by a municipal policymaker.

Because of a short limitation period under the Whistleblower Act, Breaux's state law claim against the City is based solely upon his transfer to the TRU for several months in 1994. The district court granted judgment as a matter of law on the Whistleblower Act claim because Breaux failed to exhaust his administrative remedies.[18] Breaux contends that exhaustion was not required because the police department's Internal Affairs process did not allow for complaints against the Chief of Police, but, in the alternative, he did file such a complaint. This court reviews the district court's judgment as a matter of law *de novo.* Pierce,

---

[18]   *See* Tex. Gov't Code Ann. § 554.006(a) (West 1994) ("An employee of a local government must exhaust that government's grievance or appeal procedures relating to suspension or termination of employment or unlawful discrimination before suing under this chapter.") (amended 1995).

37 F.3d at 1149.

The exhaustion requirement of the Texas Whistleblower Act is jurisdictional and, therefore, mandatory and exclusive. *See* Essenburg v. Dallas County, 988 S.W.2d 188, 189 (Tex. 1998) ("It is true that a plaintiff's failure to exhaust administrative remedies may deprive courts of subject matter jurisdiction in the dispute ... [since] the exhaustion requirement seeks to assure that the appropriate body adjudicates the dispute -- the hallmark of a jurisdictional dispute."). Moreover, the Whistleblower Act requires "the employee to utilize all procedures in place for resolving disputes at the governmental entity." Gregg County v. Farrar, 933 S.W.2d 769, 775 (Tex. App. -- Austin 1996, writ denied). Contrary to Breaux's claim on appeal, the Internal Affairs process of the Garland Police Department is broad enough to encompass claims against the Chief of Police. Under General Order 76-29, the policy of Internal Affairs is to investigate "all complaints ... of misconduct of employees who are sworn police officers." General Order 76-29. Misconduct is defined to include a violation of the general orders of the Department. In response to the City's motion for judgment as a matter of law, Breaux characterized his complaint as being "that Chief Barnett and his subordinates were retaliating against him by transferring him to the TRU for 'blowing the whistle' on Barnett's allies, Hensley and

26

Jody Lay."[19]  By alleging that the Chief of Police violated the Whistleblower Act, Breaux invoked both General Order 76-5, which subjects an officer to disciplinary action for violating state law, and General Order 76-29, which proscribes misconduct.  The administrative remedy was available to Breaux.

Breaux argues, however, that the Internal Affairs process could not resolve complaints against the Chief of Police; filing a complaint with Internal Affairs would be futile since the Chief of Police determines whether an investigation should be initiated and ultimately reviews the results.  In support of Breaux's claim, Chief Wilson testified that, "I would think if an officer had an accusation to make against the chief of police, it might be appropriate to go outside the Internal Affairs unit to do that ... [T]here's no guide book that says if you're going to accuse the chief of police of something follow steps one, two and three."

The district court rejected Breaux's argument.  Texas courts have recognized a futility exception to exhaustion requirements in only a limited number of circumstances.  *See, e.g.,* Town of Sunnyvale v. Mayhew, 905 S.W.2d 234, 246 (Tex. App. 1994), *rev'd on other grounds*, 964 S.W.2d 922 (Tex. 1998); Methodist

---

[19]     In order to show that his complaint falls outside the scope of the Internal Affairs process, Breaux also characterizes his complaint as an "employment-related dispute."  But if his complaint involved only an employment dispute, Breaux's complaint would not fall within the Whistleblower Act.  Thus, in order to maintain an action under the Act, Breaux must allege a violation of state law by Chief Barnett -- a claim that does fall within the purview of Internal Affairs.

27

<u>Hosps. of Dallas v. Texas Workers' Compensation Comm'n</u>, 874 S.W.2d 144, 149-50 (Tex. App. 1994, no writ). Since no Texas court has applied a futility exception to statutory, jurisdictional exhaustion requirements, the district court refused to "enlarge existing state law by adopting a futility exception to the Whistleblower Act's exhaustion requirement." This court also refuses to create a futility exception under such circumstances.

The purposes of the exhaustion requirement are to give the employer notice of a grievance and a chance to resolve it. As the Texas Supreme Court recently noted, the exhaustion requirement demonstrates the legislature's "will to have the agency resolve disputed issues of fact and policy." <u>Essenburg</u>, 988 S.W.2d at 189. The fact that the Act allows an employee to file a civil suit if the employer has not resolved his complaint in 30 days shows that "the legislature intended that the governmental entity should be afforded the opportunity to correct its own errors by resolving disputes before being subjected to the expense and effort of litigation." <u>Farrar</u>, 933 S.W.2d at 775.

Even if the Department's procedures for filing a grievance against the Chief of Police were unclear, the exhaustion requirement still serves a notice-giving function. Texas courts have recognized a futility exception only in cases where it was impossible for the governmental agency to address an issue, e.g.,

28

the constitutionality of a statute.[20]  But here, requiring notice even if the available grievance procedures are not clearly delineated would have enabled the City either to develop a record for judicial review on fact questions (if not to resolve the dispute about the transfer) or possibly to mitigate Breaux's damages by transferring him out of the TRU sooner.  To repeal exhaustion when grievance procedures are ambiguous would eliminate the notice-giving effect of the Act's exhaustion requirement, which has been held to supersede general presentment requirements.[21]  *Id.* at 773.  Furthermore, requiring an employee to exhaust his remedies, which could delay a civil suit by only 30 days, is hardly onerous or unfair.

In any event, the premise of Breaux's argument for the futility of exhaustion appears incorrect.  General Order 76-29

---

[20]    The cases Breaux cites as examples of exceptions to the exhaustion requirement involved situations where there clearly was no way for the agency involved to provide relief.  *See* Texas State Bd. of Pharmacy v. Walgreen Texas Co., 520 S.W.2d 845 (Tex. 1975) (agency powerless to determine constitutionality of statutes); City of Austin v. Phipps, 344 S.W.2d 673 (Tex. 1961) (Civil Service Commission given no jurisdiction over denial of injury leave of absence); Birdville Indep. Sch. Dist. v. First Baptist Church, 788 S.W.2d 26 (Tex. App. -- Fort Worth 1988, writ denied) (agency powerless to decide constitutionality of statute).  As discussed above, this is not the case in the present action.

[21]    Even if the grievance procedure is ambiguous with respect to filing complaints against the Chief of Police, Texas case law suggests that an employee is not exempt from the need to notify his employer that the employee is about to file a Whistleblower claim in court.  Under the Act, when "it is unclear whether the employer has a post-termination grievance procedure, or it is unclear what the procedure is and when ... the terminated employee [timely] notifies the employer that he is invoking that employee's grievance procedure, informing the employer that it has 30 days in which to conclude the grievance procedure," the employee would meet the statute of limitations provision in the Act.  Beiser v. Tomball Hosp. Auth., 902 S.W.2d 721, 724 (Tex. App. -- Houston [1st Dist.] 1995, writ denied).  Since the limitations period is tolled by a proper invocation of grievance procedures, this holding speaks directly to exhaustion.

permits Internal Affairs to investigate all complaints against <u>any</u> sworn police officer, thus including the Chief of Police. Under General Order 76-29, an officer can complain of misconduct to any supervisor, and "the complainant should be referred to Internal Affairs directly if possible." General Order 78-61 provides for a line of succession in command if the Chief of Police is determined to be incapacitated because, *e.g.*, the Chief is recused from a matter due to a conflict of interest. As a result, the Internal Affairs process is equipped to handle a complaint against the Chief of Police or, at least, to provide the Department and the City with notice of an employee's potential claim. Because the Internal Affairs regulations do not preclude a complaint against the Chief and indeed contemplate the necessity of circumventing the Chief, and because the exhaustion requirement advances Texas' concern with giving employers notice, a futility exception to the Whistleblower Act exhaustion requirement is inappropriate.

Finally, Breaux contends that his letter to Chief Barnett, entitled "Request Consideration for Transfer," effectively initiated the Internal Affairs process for exhaustion purposes. General Order 76-29 provides that an officer's complaint may be "initiated by submitting a written memorandum to the Director of Police Services requesting an investigation and detailing the conduct being complained about." Breaux's letter stated that (1) he "was ordered into the TRU, against [his] will," (2) he "did

not request assignment to this position," and (3) "the transfer was directly related to dictates of a previous police administrator." Breaux neither provided any details about retaliatory conduct nor requested an investigation into the transfer. At most, he requested that a written explanation be given if his request for a transfer were denied: "I am not aware of any reasons that would prohibit me from this requested transfer to an enforcement position in patrol; but if any exist, I would appreciate being advised in writing so that the issue could be confronted and resolved."[22] His letter was insufficient to state a complaint under General Order 76-29 or to exhaust under the Whistleblower Act.[23]

    2.    Ambrogio's appeal

        Ambrogio appeals only the taxing of some of the City's costs against him. In its May 8, 1998, Amended Judgment, the district court dismissed all claims against the City and taxed 40% of the City's costs of court against Ambrogio. This court reviews a district court's award of costs for an abuse of discretion. Fogleman v. ARAMCO, 920 F.2d 278, 285 (5th Cir. 1991).

        The taxation of costs is allowed "as of course to the

---

[22]    In his letter to Chief Barnett, Breaux asked permission "to transfer back to the uniform patrol division during the next seniority selection process" in the fall of 1994. Barnett granted Breaux's request, and Breaux returned to patrol duty in November 1994.

[23]    The case Breaux cites for broadly construing his alleged complaint is distinguishable. In Farrar, the court found that a letter complaining of a demotion "without just cause" was sufficient to provide notice that the complaint was about "retaliatory employment practices." Farrar, 933 S.W.2d at 774. But Farrar, unlike Breaux, had written a letter specifically to a grievance committee, initiating a committee hearing about Farrar's demotion.

31

prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d)(1). In this case, the City clearly prevailed against Ambrogio. None of Ambrogio's claims against the City went to the jury, and he does not appeal the district court's pretrial dismissal of those claims. On appeal, Ambrogio does not explain how the district court abused its discretion in apportioning costs against him.

## IV. CONCLUSION

The police officers failed to make out a First Amendment retaliation claim. Even though they persuaded the jury, and we have assumed, that they truthfully spoke out to reveal political investigations of public officials, the exercise of First Amendment rights is not enough. The retaliation they complained of -- investigations, criticisms, public (but withdrawn) reprimands, psychological and polygraph testing, suspension with pay, transfer to the TRU -- do not, either individually or collectively, constitute adverse employment actions. The actions taken by Hensley and Holifield did not give rise to § 1983 liability. For reasons previously explained, we have rejected the other issues raised on appeal.

This court reverses the judgment for the Plaintiffs on their § 1983 claims against the individual Defendants and renders a take-nothing judgment against the Plaintiffs on these claims. We affirm the district court's dismissal of the City as a Defendant

32

and the taxing of costs against Ambrogio.

**AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**