**Ward CHURCHILL, Plaintiff–Appellant,**

v.

**The UNIVERSITY OF COLORADO AT BOULDER and Regents of the University of Colorado, a body corporate, Defendants–Appellees.**

**No. 09CA1713.**

Colorado Court of Appeals, Div. V.

Nov. 24, 2010.

---

18

Killmer, Lane & Newman, LLP, David A. Lane, Denver, Colorado; Thomas K. Carberry, Denver, Colorado; The Noble Law Firm, LLC, Antony M. Noble, Denver, Colorado, for Plaintiff–Appellant.

Patrick T. O'Rourke, Denver, Colorado; Hershey Skinner, LLC, Kari M. Hershey, Denver, Colorado, for Defendants–Appellees.

Mark Silverstein, Denver, Colorado, for Amicus Curiae ACLU Foundation of Colorado.

Aden Fine, Mariko Hirose, New York, New York, for Amicus Curiae ACLU Foundation.

Martha West, Rachel Levinson, Kathi Westcott, Washington, D.C., for Amicus Curiae American Association of University Professors.

Joan Bertin, New York, New York, for Amicus Curiae National Coalition Against Censorship.

Deatsch Law Office, Cheri J. Deatsch, Denver, Colorado; Heidi Elizabeth Boghosian, New York, New York, for Amici Curiae Center for Constitutional Rights, Latina/o Critical Legal Theory, Inc., National Lawyers Guild, and Society of American Law Teachers.

Hall & Evans, L.L.C., Beth A. Dickhaus, Denver, Colorado, for Amicus Curiae Colorado Counties, Inc.

John W. Suthers, Attorney General, Daniel D. Domenico, Solicitor General, Douglas J. Cox, Senior Assistant Attorney General, Denver, Colorado, for Amicus Curiae State of Colorado.

Opinion by Judge GRAHAM.

We are called upon to resolve questions concerning whether a university and its regents should be immune from a civil suit. Professor Ward Churchill appeals the trial court's judgment (1) directing a verdict in favor of the University of Colorado and its Board of Regents and dismissing his 42 U.S.C. § 1983 claim that the University's investigation of his academic works constituted an adverse employment action; (2) holding as a matter of law that the University was entitled to quasi-judicial immunity, vacating the jury's verdict, and entering judgment in favor of the University on his section 1983 claim that the University violated his First Amendment rights when it dismissed him; and (3) denying his motion for reinstatement, or alternatively, money damages.

We affirm.

## I. Factual Background

Churchill was a tenured professor in the University's Department of Ethnic Studies. In early 2005, in anticipation of Churchill's speaking engagement at Hamilton College, that school's student newspaper ran a story about a Churchill essay in which he compared the victims of the 9/11 World Trade Center terrorist attack to Nazi war criminals. Subsequently, there was a great deal of public and media attention surrounding Churchill and his essay.

On February 3, 2005, the University of Colorado Board of Regents held a special meeting to consider Churchill's essay and the resulting publicity. At the meeting, Interim Chancellor Phillip DiStefano announced that his office would "launch and oversee a thorough examination of Professor Churchill's writings, speeches, tape recordings and other works." In doing so, his office would attempt to answer two primary questions: (1) "[D]oes Professor Churchill's conduct including his speech, provide any grounds for dismissal for cause as described in the Regents'

Laws?" and (2) "[I]f so is this conduct or speech protected by the First Amendment against University action?" The Regents unanimously approved a resolution supporting the investigation.

Chancellor DiStefano conducted the initial investigation together with the Dean of the School of Law, David Getches, and the Dean of the College of Arts and Sciences, Todd Gleeson. Their review concluded that five of Churchill's controversial statements, including his 9/11 essay, were protected by the First Amendment. However, in the course of their investigation, numerous allegations surfaced that Churchill had engaged in research misconduct. On March 29, 2005, Chancellor DiStefano issued a report, requesting the nine-member Standing Committee on Research Misconduct (SCRM) to convene and address these allegations.

The SCRM then impaneled an Inquiry Committee to address nine allegations of Churchill's research misconduct. The Inquiry Committee received written submissions from Churchill and interviewed him. On August 19, 2005, the Inquiry Committee issued a report in which it unanimously agreed to forward seven of the nine allegations to an investigative committee.

Based on this recommendation, the SCRM formed an Investigative Committee in January 2006, which by rule included five professors who were not seated on the SCRM and who had established reputations for academic integrity, fairness, and open-mindedness. As part of the selection process, the SCRM inquired into potential biases and conflicts of interests and sought Churchill's input regarding potential members of the committee. Professor Churchill objected to Professor Wesson's serving on the Investigative Committee, suggested Professor Radalet as a member, and approved of Professor Clinton. Two members of the Investigative Committee, including Professor Clinton, were tenured professors from other universities.

The Investigative Committee heard testimony on four occasions between February 2006 and April 2006, at which time it conducted interviews of witnesses and Churchill. On May 9, 2006, it issued its report in which

it found by a preponderance of the evidence that Churchill had committed research misconduct in five areas: (1) falsification, (2) fabrication, (3) plagiarism, (4) failure to comply with established standards regarding author names on publications, and (5) serious deviation from accepted practices in reporting research results. Three members of the Committee believed that the research misconduct was so serious that it satisfied the criteria for revocation of tenure and dismissal. Two members felt that Churchill's conduct warranted suspension without pay for two years.

The SCRM then reviewed the Investigative Committee's report and Churchill's written response. On June 13, 2006, it issued its own report in which six voting members recommended Churchill's dismissal. Three voting members recommended suspension without pay—two recommended a five-year suspension and one recommended a two-year suspension.

Citing the reports by the SCRM and its Investigative Committee, on June 26, 2006, DiStefano issued a notice of intent to seek dismissal of Churchill for conduct that falls below minimum standards of professional integrity. Pursuant to the University's dismissal for cause and grievance process set forth in the Laws of the Regents (Laws), Churchill appealed this proposed dismissal, requesting a hearing before the Faculty Senate Committee on Privilege and Tenure (P & T Committee). He alleged that the University engaged in selective enforcement of research misconduct policies in retaliation for his exercise of free speech.

The five-member P & T Committee held a seven-day hearing. A complete record of these proceedings was transcribed and filmed by a court reporter and a videographer. At that hearing, Churchill was represented by counsel, who made an opening statement, presented expert witnesses, cross-examined the University's witnesses, and presented a written closing argument. On May 3, 2007, the P & T Committee issued its report, unanimously concluding that the University had met its burden of proving the existence of "conduct which falls below minimum standards of professional integrity" by

clear and convincing evidence. The P & T Committee found by clear and convincing evidence:

- Three instances of evidentiary fabrication by ghostwriting and self-citation.
- Two instances of evidentiary fabrication.
- Two instances of plagiarism.
- One instance of falsification.

The P & T Committee also found that Churchill did not meet his burden of proving by a preponderance of the evidence that he was denied procedural due process in the SCRM investigation or that he was being subjected to selective enforcement of the University's rules concerning research misconduct. Two members of the P & T Committee recommended dismissal. Three members of the P & T Committee recommended that Churchill be suspended without pay for one year and that his rank be reduced to Associate Professor.

University President Hank Brown reviewed the reports of the Investigative Committee, the SCRM, and the P & T Committee. He concurred with the P & T Committee's observation that Churchill engaged in conduct that fell below the minimum standard of professional integrity. He concurred with two members of the P & T Committee that Churchill should be dismissed because Churchill's research misconduct had been severe and deliberate, and the misconduct seriously impacted the University's academic reputation. He then recommended that the Board of Regents dismiss Churchill.

In accordance with Regent Policy 5–I, § IV, Churchill requested a hearing before the Regents. Prior to the hearing, he submitted comprehensive written argument. The Regents conducted a hearing and considered the argument, reports, and recommendations. The Regents dismissed Churchill by a vote of eight to one.

## II. Procedural History

Churchill brought several claims against the University, the Board of Regents, and the Regents in their individual and official capacities, alleging, inter alia, that they had

violated 42 U.S.C. § 1983 by launching an investigation of his academic works and for terminating him, all in retaliation for his having exercised his right to free speech.

Prior to trial, the parties streamlined the proceedings by stipulating that the University would waive its immunity under the Eleventh Amendment to the United States Constitution, allowing Churchill to maintain direct claims against the University and its Regents. In exchange, Churchill agreed to allow the University and the Regents to assert any defenses that would have been applicable to any of the University's officials or employees acting in their official capacities. One of those defenses raised by individuals acting in their official capacities was quasi-judicial immunity. Additionally, in the trial management order, the parties agreed that the University and the Regents preserved the defense of quasi-judicial immunity and that argument on this defense would be presented after the jury reached a verdict.

At trial Churchill advanced only two claims: that the investigation and termination (1) were unlawful adverse employment actions in violation of his rights under 42 U.S.C. § 1983 and (2) were in retaliation of his exercise of First Amendment rights. The claims were essentially identical in wording and counsel did not distinguish between them, arguing in opening and closing that the Regents "were always going to fire [Churchill]."

The trial lasted four weeks. At the conclusion of the evidence, the University moved for a directed verdict on Churchill's unlawful investigation claim, arguing that the investigation was not an adverse employment action under 42 U.S.C. § 1983. Churchill argued that the jury should determine whether the investigation constituted an adverse employment action. The district court granted the University's motion for a directed verdict.

The jury deliberated on Churchill's claim that the University unlawfully terminated him for his First Amendment speech. In finding in favor of Churchill, the jury concluded that "the Board of Regents of the University of Colorado use[d] [Churchill's] protected speech activity as a substantial or motivating factor in the decision to discharge [him] from employment," and that the termination harmed Churchill.

In addition, the jury found that the University and the Regents had not shown by a preponderance of the evidence that Churchill would have been dismissed for reasons other than his exercise of free speech. However, the jury awarded Churchill $0 in past noneconomic damages and only $1 in past economic loss.

Having preserved the defense of quasi-judicial immunity, the University filed a post-trial motion for judgment as a matter of law claiming that the University and the Board of Regents were immune from Churchill's second claim. Churchill filed a post-trial motion for reinstatement to his position.

In a thoughtful and well-reasoned written order, the trial court granted the University's motion, finding that the Board of Regents performed a judicial function and acted in a quasi-judicial capacity when it terminated Churchill's employment, entitling it and the University to quasi-judicial immunity.

The trial court further ruled that Churchill was not entitled to either reinstatement or front pay.[1] It denied his motion for reinstatement because that remedy would "disregard the jury's implicit finding that Professor Churchill has suffered no actual damages that an award of reinstatement would prospectively remedy." Additionally, the trial court determined that reinstatement was inappropriate because it would undermine the University's ability to define the standards of scholarship. Finally, the trial court concluded that on the basis of the evidence adduced at trial regarding Churchill's hostility toward the University, reinstatement was not likely to result in a "productive and amicable working relationship" between the University and Churchill.

Churchill now argues on appeal that the trial court erred by (1) granting the Univer-

---

1. Front pay would consist of pay from the entry of judgment to the date of reinstatement, or, if there was a diminution in earning capacity, until Churchill's earning capacity had fully recovered. *Black v. Waterman,* 83 P.3d 1130, 1133 (Colo. App.2003).

sity's motion for a directed verdict because he had presented sufficient evidence from which the jury could determine that the University's actions were an adverse employment action; (2) granting the University's motion for judgment as a matter of law because the Regents were not entitled to quasi-judicial immunity; and (3) denying his motion for reinstatement.

We affirm the trial court's judgment.

## III. Analysis

### A. Quasi–Judicial Immunity

Churchill advances several arguments to support his contention that the trial court improvidently granted the University and the Regents quasi-judicial immunity. He contends that the University and the Regents failed to satisfy four specific conditions of immunity: that the Regents were not an independent body of hearing officers; that the Regents evinced bias which barred them from considering his discipline; that there is no adequate means of reviewing the Regents' decision; and that quasi-judicial immunity was not available as a defense. We reject each contention in turn.

■■■ We review a district court's conclusion regarding immunity de novo. *See Peper v. St. Mary's Hosp. & Med. Ctr.*, 207 P.3d 881, 888 (Colo.App.2008); *see also Gagan v. Norton*, 35 F.3d 1473, 1475 (10th Cir.1994) (questions of absolute immunity reviewed de novo). Whether the Board of Regents had quasi-judicial immunity (and therefore, absolute immunity) is a question of law to be determined by the court, not the jury. *See Scott v. Hern*, 216 F.3d 897, 908 (10th Cir. 2000) (determination of absolute immunity reviewed de novo); *see also Miller v. Davis*, 521 F.3d 1142, 1145 (9th Cir.2008) ("Whether a public official is entitled to absolute immunity is a question of law . . . ." (quoting *Goldstein v. City of Long Beach*, 481 F.3d 1170, 1172 (9th Cir.2007))); *Brewer v. Blackwell*, 692 F.2d 387, 390 (5th Cir.1982) ("whether an official is protected by judicial immunity is a question of law").

We begin our analysis with a discussion of general precepts concerning quasi-judicial immunity.

■■■ Absolute immunity protects officials whose "special functions or constitutional status requires complete protection from suit." *State Bd. of Chiropractic Exam'rs v. Stjernholm*, 935 P.2d 959, 968 (Colo.1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Absolute immunity typically provides judges and prosecutors with a complete defense "to preserve their 'independent decision-making and to prevent undue deflection of attention from public duties.' " *Id.* (quoting *Higgs v. Dist. Court*, 713 P.2d 840, 850 (Colo.1985)). Quasi-judicial activity is defined as "[o]f, relating to, or involving an executive or administrative official's adjudicative acts." *Hoffler v. Colorado Dep't of Corr.*, 27 P.3d 371, 374 (Colo.2001) (quoting *Black's Law Dictionary* 1258 (7th ed.1999)). " 'Quasi-judicial' decision making, as its name connotes, bears similarities to the adjudicatory function performed by courts." *Widder v. Durango Sch. Dist. No. 9–R*, 85 P.3d 518, 527 (Colo.2004).

■■■ In determining when an administrative official's actions are quasi-judicial, "[t]he central focus, in our view, should be on the nature of the governmental decision and the process by which that decision is reached." *Id.* (quoting *Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.*, 757 P.2d 622, 627 (Colo.1988)). When a governmental decision is likely to affect the rights and duties of specific individuals, and the government agents reach the decision by applying preexisting legal standards or policy considerations to present or past facts, the governmental body is generally acting in a quasi-judicial capacity. *Sherman v. City of Colorado Springs Planning Comm'n*, 763 P.2d 292, 295–96 (Colo.1988).

#### 1. The *Cleavinger* Conditions

We first address and reject Churchill's contention that the trial court erred in granting the University and the Board of Regents quasi-judicial immunity because those officials failed to satisfy six specific conditions for immunity under *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985).

In *Cleavinger*, inmates in a federal correctional facility were instrumental in a work stoppage that protested a series of prison deaths which the inmates believed to be racially motivated. They were placed in administrative segregation and brought before the facility's discipline committee. The committee ordered that Saxner forfeit eighty-four days of good time and be placed in administrative detention. Ultimately, Saxner appealed, arguing that his Fifth Amendment due process rights had been violated. On appeal, the Seventh Circuit Court of Appeals concluded that the committee had absolute immunity. *Saxner v. Benson*, 727 F.2d 669 (7th Cir.1984). The Supreme Court disagreed and determined that the committee had only qualified immunity because it was subordinate to the warden, subject to the pressure of employment, and lacked independence. The Court relied in part upon *Butz v. Economou*, 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), a decision which granted quasi-judicial immunity to officials in the Department of Agriculture who sustained the revocation of a commodity futures merchant's registration. *Butz* discussed several factors that were useful in analyzing whether the officials' work was functionally equivalent to the judicial process. *Cleavinger* addressed those factors:

> [I]n *Butz*, the Court mentioned the following factors, *among others*, as characteristic of the judicial process and to be considered in determining absolute as contrasted with qualified immunity: (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 201–02, 106 S.Ct. 496 (emphasis added).[2]

We perceive nothing in *Cleavinger* that requires the strict application of the *Butz*

factors in determining whether a board or governmental body should be granted absolute immunity.

Indeed, our own supreme court has used other factors in determining whether the actions of government officials are functionally equivalent to a judge's role and therefore should be cloaked with absolute immunity. *See Cherry Hills*, 757 P.2d at 627–28 (focusing upon the process by which a governmental decision is reached).

We do not interpret Colorado law to be at odds with *Cleavinger*. Instead we view *Cleavinger* and *Butz* as prescribing nonexclusive standards which are useful in analyzing quasi-judicial actions. *Cherry Hills* explained the essence of quasi-judicial action and three defining factors which must exist in order for a tribunal to act in a judicial or quasi-judicial capacity:

> [T]his court ... outlined three factors of quasi-judicial action ...: (1) a state or local law requiring that the governmental body give adequate notice before acting on the matter; (2) a state or local law requiring the governmental body to conduct a public hearing, pursuant to notice, at which concerned citizens may be heard and present evidence; and (3) a state or local law requiring the governmental body to make a determination based upon an application of legal criteria to the particular facts before it. [*Snyder v. City of Lakewood*, 189 Colo. 421, 425, 542 P.2d 371, 374 (1975) ].

> Our decision in *Snyder* proceeded from a recognition that the essence of quasi-judicial action lies not so much in the specific characteristics of the decision-making body as in the nature of the decision itself and the process by which that decision is reached.

*Cherry Hills*, 757 P.2d at 626.

■ Nothing in *Cleavinger* suggests to us that the factors mentioned in *Butz* should be applied as a strict litmus test. *Butz* made clear that there should be present features of the judicial process which "tend to enhance the reliability of information and the impar-

---

**2.** Churchill contends that *Cleavinger* clarified *Butz*. We are unable to find any language in *Cleavinger* that clarifies *Butz*. However, we note

that *Cleavinger* did not apply all of the factors mentioned in *Butz* as indicia of the judicial process.

tiality of the decisionmaking process." 438 U.S. at 512, 98 S.Ct. 2894. "We think that adjudication within a federal administrative agency shares *enough of the characteristics of the judicial process* that those who participate in such adjudication should also be immune from suits for damages." *Id.* at 512–13, 98 S.Ct. 2894 (emphasis added).

 Here, the trial court determined that the process employed by the University and the Regents shared enough of the features of traditional judicial process that for purposes of immunity, it was functionally equivalent to the judicial process. We agree.

The process employed by the Regents incorporates many of the characteristics of the judicial process. The Board of Regents is empowered by the Colorado Constitution and by statute to enact the laws governing the University of Colorado. Colo. Const. art. VIII, § 5(2); § 23–20–111, C.R.S.2010. The Regents appoint and can fire the president of the University as well as the chairman and vice chairman. Colo. Const. art. IX, § 13. The entire process employed by the Regents followed strict guidelines under laws promulgated by them, afforded adequate notice of public hearings, and invoked an adversary process in which Churchill was represented by counsel and permitted to introduce evidence, examine witnesses, and make argument. We consider the process and the nature of the Board's actions to satisfy the standards under both Colorado law and *Butz* and are convinced that the grant of absolute immunity was appropriate.

Colorado courts have often afforded absolute immunity to administrative officials acting in a quasi-judicial role. *See Stjernholm,* 935 P.2d at 969 (Chiropractic Board members immune from 42 U.S.C. § 1983 claim when performing quasi-adjudicative functions such as licensing and conducting professional discipline hearings); *State v. Mason,* 724 P.2d 1289, 1291 (Colo.1986) (members of the Parole Board, a Colorado administrative agency, entitled to quasi-judicial immunity when granting, denying, or revoking parole). Colorado law comports with the grant of quasi-judicial immunity in other jurisdictions.

In *Gressley v. Deutsch,* 890 F.Supp. 1474 (D.Wyo.1994), a professor publicly complained after the university transferred him to another department. *Id.* at 1480. The university's president then initiated proceedings to terminate the professor for several reasons, including insubordination. *Id.* at 1481. After hearing two weeks of testimony, the faculty committee recommended dismissal. *Id.* The professor appealed the decision to the board of trustees, which sustained the committee's dismissal recommendation. *Id.* at 1481–82. The professor then brought claims against each of the trustees individually under 42 U.S.C. § 1983, alleging that they unconstitutionally discharged him in retaliation for his exercise of free speech. *Id.*

The trial court found that the trustees had quasi-judicial immunity because the board of trustees' sole purpose was to sit as an appellate body to review the faculty committee's decision. *Id.* at 1491. Moreover, sufficient safeguards existed to control unconstitutional conduct, including the requirement that the committee keep a verbatim record and issue a written decision. *Id.* Finally, the trustees were specifically limited to the record before them in making their decision. *Id.*

Here, unlike the prison officials in *Cleavinger,* the Board of Regents also acted as an appellate body when it reviewed the University President's dismissal recommendation based on the various committee reports. The Regents were not subject to employment pressures which caused the court concern in *Cleavinger.* Also, the Laws and Policies of the Board of Regents afforded Churchill the same protections as those in *Gressley,* among many others.

We conclude that the nature of the decision reached by the University and its Regents, and the process by which that decision was reached, shared enough characteristics with the judicial process to warrant absolute immunity from liability. We perceive no error in the trial court's analysis which looked to the nature and process of the University and the Regents' activities in concluding that there was enough functional similarity between their actions and the judicial process to justify the application of quasi-judicial immunity.

## 2. The Process Assured Independence of the Reviewing Officials

 Churchill contends that the Regents were not an independent, professional body of hearing officers and that the Regents lacked political independence. We disagree.

The Colorado Constitution created the University of Colorado as a state institution of higher education. Colo. Const. art. VIII, § 5. The Board of Regents is empowered to "enact laws for the government of the University." § 23–20–112(1), C.R.S.2010; *see also* Colo. Const. art. VIII, § 5(2) (Board of Regents "shall have the general supervision of [the University of Colorado] and the exclusive control and direction of all funds"). There are nine regents who are each elected to a six-year term. Colo. Const. art. IX, § 12. The regents are limited to two six-year terms. Colo. Const. art. XVIII, § 11(1). As an independent and elected board, the Regents are not part of the executive or legislative branches, which assures that they can conduct their functions without harassment or intimidation.

Pursuant to this authority, the Board of Regents enacted the Laws. The Laws include the grounds and procedures for dismissing a tenured member of the University's faculty. For a tenured faculty member to be removed under the Laws:

> A faculty member may be dismissed when, in the judgment of the Board of Regents and subject to the Board of Regents constitutional and statutory authority the good of the university requires such action. The grounds for dismissal shall be demonstrable professional incompetence, neglect of duty, ... or other conduct which falls below minimum standards of professional integrity.

Laws art. 5.C.1.

The Laws specify that "[n]o member of the faculty shall be dismissed except for cause and after being given an opportunity to be heard." Laws art. 5.C.2(A)(1). If the University's administration contemplates a faculty member's dismissal, the faculty member may request a hearing before the P & T Committee. Laws art. 5.C.2 (B). At such a hearing, the faculty member "shall be per-mitted to have counsel and the opportunity to question witnesses." Laws art. 5.C.2(B). The University must prove its case for dismissal by clear and convincing evidence. Regents Policy 5–1 § III(B)(2)(n).

We are not persuaded by Churchill's suggestion that because the Regents are elected officials, they were under extreme political pressure to resolve any dispute against him. Simply because Regents are elected does not defeat impartiality. Elected city council members have been entitled to absolute immunity for their decision to impeach the city's mayor because they were acting in a judicial capacity. *Brown v. Griesenauer,* 970 F.2d 431, 439 (8th Cir.1992).

*Brown* recognized that elected officials were "not insulated from political influence," and the "[i]mpeachment proceedings by their very nature are likely to be extremely controversial and fiercely political." *Id.* at 438–39. However, the mayor had been entitled to "extensive procedural safeguards" including the right to notice, the right to be represented by an attorney, the right to conduct discovery, the right to cross-examine witnesses, and the right to judicial review, among others. *Id.* at 438.

The dismissal process here afforded Churchill extensive procedural safeguards. A comprehensive record was available for review by the Regents, and Churchill was permitted to make argument through counsel, citing evidence. Regents testified that they voted for Churchill's dismissal only after extensively reviewing the record and the recommendations of the P & T Committee, and examining details of Churchill's research misconduct.

The process by which the University and the Regents reached their decision also shares characteristics with the judicial process because it established a multi-step review which provided independent investigation and evaluation by peers, independent faculty members, and elected officials.

In a similar case, the Colorado Supreme Court concluded that a Department of Corrections staff discipline proceeding was quasi-judicial. *Hoffler,* 27 P.3d at 374–75. The court noted that the proceedings were adver-

sarial in nature, the employee was entitled to be represented by counsel, the employee was allowed to cross-examine adverse witnesses, and the hearing officer was required to make written findings of fact and conclusions of law. *Id.*

The process here afforded Churchill by the University and the Laws and Policies of the Board of Regents included those safeguards found in *Hoffler* and more:

- The investigation of the allegations of Churchill's research misconduct and the dismissal process involved twenty-five faculty members (six Inquiry Committee members, five Investigative Committee members, nine SCRM members, and five P & T Committee members);

- Dismissal was only determined upon proof of cause, including clear and convincing evidence of "conduct which [fell] below minimum standards of professional integrity." Regents Policy 5–1, § I;

- Churchill received written notification of the intent to dismiss and was granted the right to contest it with the aid of counsel. *Id.* at 5–1, § III(A);

- Churchill exercised his right to request that specific P & T Committee members be excluded. *Id.* at 5–1, § III(B)(2)(b);

- Churchill exercised his right to be represented by counsel at various stages of the proceedings. *Id.* at 5–1, § III(B)(1)(b)(2)(i);

- Churchill was granted the right to have fellow faculty members sit as the members of the P & T Committee. *Id.* at 5–1, § II(A);

- Churchill exercised his right to cross-examine witnesses. *Id.* at 5–1, § III(B)(2)(p);

- Churchill presented witnesses, including expert witnesses. *Id.* at 5–1, § III(B)(2)(o);

- Churchill was granted the right to present opening statements. *Id.* at 5–1, § III(B)(2)(r);

- Churchill exercised his right to present both oral and written closing arguments. *Id.*;

- The University was required to demonstrate grounds for Churchill's dismissal by clear and convincing evidence. *Id.* at 5–1, § III(B)(2)(n);

- Churchill had the benefit of a written report prepared by the P & T Committee which contained findings of fact, conclusions, and recommendations. *Id.* at 5–1, § III(C)(1);

- Churchill exercised his right to object to the P & T Committee's findings and recommendations. *Id.* at 5–1, § III(C)(2);

- Churchill had the right to file a written report with the Board of Regents regarding the University President's recommendation for dismissal. *Id.* at 5–1, § IV;

- Churchill demanded and was granted under the Laws a hearing before the Board of Regents in which he was represented by counsel who presented and argued his case. *Id.*;

- The Board of Regents' decision was limited to the record of the case and the transcript of the proceedings before the P & T Committee. *Id.* (Here, Churchill was afforded both a transcribed record and a video record of proceedings.);

- The Board of Regents was required to take action on the President's recommendation in a public meeting. *Id.*

These important procedures and rights were a basis for the trial court's conclusion that the Regents' process closely resembled the judicial process. The Regents applied preexisting policies and policy considerations to Churchill's case. *See Hoffler*, 27 P.3d at 374 (department of corrections application of administrative regulation in staff discipline proceedings was quasi-judicial); *Widder*, 85 P.3d at 527–28 (school district's decision applying conduct and discipline code in employee termination case to past or present facts was quasi-judicial).

### 3. Allegations of Bias

 Churchill next contends that the Regents evidenced bias against him, indicating that they were not impartial arbiters and therefore ought not to be cloaked with immunity. He argues that if the Regents had been judges, they would have been required to recuse themselves under one or more of

the Canons of Judicial Conduct.[3] He cites the following[4] as evidence of bias requiring recusal during the investigation of his academic works and dismissal:

- Regents Thomas Lucero and Jerry Rutledge said in February 2005 that Churchill should be fired.
- Regent Michael Carrigan told a New York Times reporter, "We can fire Churchill. We just can't fire him tomorrow."
- Chancellor DiStefano described the tenor of the emergency meeting of the Board of Regents on February 3, 2005 as explosive. At the emergency meeting, DiStefano called Churchill's essay the "most offensive, the most appalling political expression[ ]," and proposed to launch and oversee an investigation of Churchill's work to see if there was cause for dismissal.
- The Board of Regents unanimously adopted a resolution supporting an investigation.
- Regent Patricia Hayes agreed that she voted in favor of the Board of Regents' resolution authorizing DiStefano to investigate Churchill's academic works to see if there were grounds for dismissal.

▮▮▮ Churchill misconstrues the purpose and scope of quasi-judicial immunity. The protection essential to independence and discretion by the University and the Regents would be gone if they were subject to the intimidation of a lawsuit seeking to undo every decision to terminate a faculty member. *See Butz*, 438 U.S. at 516, 98 S.Ct. 2894. One who asserts that he lost a suit because the judge was biased may have a remedy under C.R.C.P. 106 seeking to reverse an abuse of discretion, but he does not have the right to sue the judge in a civil suit for damages.

▮▮▮ Administrative officials like the Regents and the P & T Committee can be expected to make unpopular decisions regarding research misconduct by professors and therefore become subject to claims of bias. This ought not deprive investigating officials of immunity. Decisions to discipline professors who do not meet standards of integrity or scholarship will no doubt be unpopular and disputed. But such self-policing does not indicate bias and it ought not subject faculty and the Regents to liability for enforcement. Otherwise academic freedom would not be preserved. "[T]he only way to preserve academic freedom is to keep claims of academic error out of the legal maw." *Feldman v. Ho*, 171 F.3d 494, 497 (7th Cir. 1999). Thus, even against claims of bias, a judge or an official performing quasi-judicial functions can be immune from suit. *Cleavinger* recognized the "need to assure that the individual can perform his functions without harassment or intimidation." 474 U.S. at 202, 106 S.Ct. 496. The University's governance appears to be designed to permit the regulation of integrity and academic standards.

3. Although they are similar, Churchill cites the ABA Model Code of Judicial Conduct (2004), rather than the Colorado Code of Judicial Conduct, as providing a basis for recusal.
 - "A judge shall uphold the integrity and independence of the judiciary." ABA Model Code of Judicial Conduct Canon 1.
 - "A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." *Id*. Canon 2.
 - "A judge shall perform the duties of judicial office impartially and diligently." *Id*. Canon 3.

4. Churchill also claims that Professor Marianne Wesson sent an email on February 28, 2005, claiming, "[T]he rallying around Churchill reminds me unhappily of the rallying around OJ Simpson and Bill Clinton and now Michael Jackson and other charismatic male celebrity wrongdoers...." She also called Churchill an "un-

pleasant (to say the least) individual." However, Professor Wesson was not a Regent. Nor are we persuaded that Professor Wesson evinced such bias that the investigation of Churchill was somehow tainted. The P & T Committee specifically addressed this issue in its report. It provided that three of the Investigative Committee members testified that Professor Wesson was fair and unbiased and made no "predetermination." It also noted that the "Investigative Committee hearing transcripts suggest a generally cooperative approach to getting the job done" between Professor Wesson and Churchill. The P & T Committee determined that, for this and other reasons, Churchill had not met his burden of proving lack of due process by a preponderance of the evidence. Churchill does not point to any specific action taken by Professor Wesson during the proceedings that demonstrates bias.

Furthermore, the record before us does not establish the bias Churchill claims. At trial, Regent Lucero denied that he had ever called for Churchill to be fired. He also said that his decision to dismiss Churchill was based on the reports of the Investigative Committee, the SCRM, and the P & T Committee, all of which had agreed that Churchill committed research misconduct. He also seriously considered President Brown's recommendation for dismissal since Brown was the day-to-day leader of the University.

Any arguable bias Regent Rutledge may have injected into the investigative process is eclipsed by the fact that he was no longer a member of the Board of Regents when it voted in favor of dismissing Churchill.

Although the Regents passed the resolution supporting an investigation of Churchill's academic works, Chancellor DiStefano testified that after the emergency Board of Regents meeting he was never pressured by any Regent to reach a certain outcome regarding Churchill's speech. Although Churchill has pointed to evidence of alleged bias on the part of three voting Regents, the Regents voted to dismiss him by a vote of eight to one.

Regents Hyble and Carrigan also testified that their votes to dismiss were based in part on the fact that the faculty who investigated Churchill (his peers) unanimously concluded that he had engaged in research misconduct.

We are likewise not persuaded that Chancellor DiStefano demonstrated such bias as to warrant his recusal. We note that Chancellor DiStefano is not a Regent and was not entitled to vote. He harshly criticized Churchill's essay at the emergency Board of Regents meeting on February 3, 2005. Yet after conducting an investigation with Dean Getches and Dean Gleason, he announced that Churchill's statements were protected by the First Amendment. Although Chancellor DiStefano later issued a notice of intent to recommend the dismissal of Churchill, the record indicates that by that time, the Chancellor was basing his recommendation for dismissal on the Investigative Committee's report and the SCRM recommendations. He highlighted the fact that both the report and the recommendation found that Churchill had engaged in three types of research misconduct—plagiarism, fabrication, and falsification that constituted "a pattern of serious, repeated and deliberate research misconduct fall[ing] below minimum standards of professional integrity." Additionally, Chancellor DiStefano stated that Churchill "repeatedly failed to acknowledge any error or to take any responsibility for any of the research misconduct." Therefore, there is no record support for the conclusion that the notice was the product of bias.

In a similar case, the Seventh Circuit Court of Appeals provided some illuminating commentary:

A university's academic independence is protected by the Constitution, just like a faculty member's own speech. Concurring in *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957), Justices Frankfurter and Harlan referred to the four freedoms *of a university:* "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Although statutes have curtailed some of these freedoms (for example, no university today may use racial criteria to select its faculty), [Professor] Feldman does not rely on any particular statute, as opposed to the all-purpose 42 U.S.C. § 1983 that provides a hook for enforcing the Constitution against state actors. Yet the Constitution does not commit to decision by a jury every speech-related dispute. If it did, that would be the end of a university's ability to choose its faculty—for it is speech that lies at the core of scholarship, and every academic decision is in the end a decision about speech.

*Feldman,* 171 F.3d at 495–96 (emphasis in original). That a university is zealous in policing the academic standards of its faculty does not demonstrate bias against a noncompliant faculty member so much as it demonstrates a bias in favor of compliance with the rules of academia.

### 4. Adequacy of C.R.C.P. 106 Review

Churchill also contends that the process employed by the University and the Regents

must be subject to adequate appellate review. He argues that C.R.C.P. 106 review is limited and inadequate.

■ We are unaware of any Colorado decision which requires full appellate review of quasi-judicial action. C.R.C.P. 106(a)(4) review provides for district court relief "[w]here any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law." The district court's review is limited to a determination of whether the body or officer exceeded its jurisdiction or abused its discretion based on the evidence in the record. C.R.C.P. 106(a)(4)(I); *see also Widder*, 85 P.3d at 526–27 ("Abuse of discretion means that the decision under review is not reasonably supported by any competent evidence in the record."). C.R.C.P. 106(a)(4) does not provide for a new evidentiary hearing at the district court level. *Widder*, 85 P.3d at 526. Nevertheless, *Widder* concluded that a school board's decision to terminate an employee was a quasi-judicial decision that was "properly reviewed under Rule 106(a)(4)." *Id.* at 528. We note that here, Churchill has asserted that some Regents were biased and lacked independence. These allegations clearly could have been reviewed in a Rule 106 appeal because they implicate an abuse of discretion, if proven.

We also reject Churchill's argument that *People in Interest of B.C.*, 981 P.2d 145, 149 n. 4 (Colo.1999), supports the proposition that C.R.C.P. 106 does not provide him with an adequate substantive method for challenging immunity. The cited footnote in *B.C.* simply highlights the general rule that "the rules of civil procedure are procedural and do not attempt 'to abridge, enlarge, nor modify the substantive rights of any litigants.'" *Id.* (quoting *Crowley v. Hardman Bros.*, 122 Colo. 489, 498, 223 P.2d 1045, 1049 (1950)). It does not call into question the adequacy of C.R.C.P. 106(a)(4) review, and Churchill does not otherwise cite support for this argument. *See Biel v. Alcott*, 876 P.2d 60, 64 (Colo.App. 1993) (appealing party bears burden to provide supporting authority for contentions on appeal).

■ Churchill has cited no decision, and we have found none, standing for the proposition that a governmental body may not be afforded quasi-judicial immunity if its actions are only reviewable for an abuse of discretion. Nor does *Cleavinger* define the scope of factor "(f) the correctability of error on appeal." *See Cleavinger*, 474 U.S. at 202, 106 S.Ct. 496. We conclude that C.R.C.P. 106(a)(4) review is sufficient for purposes of assuring that the University's and the Regents' actions were functionally equivalent to the judicial process.

The Board of Regents' decision to terminate Churchill was properly reviewable under C.R.C.P. 106(a)(4). *See Widder*, 85 P.3d at 528 (school board's decision to terminate employee properly reviewed under C.R.C.P. 106(a)(4)); *Hellas Constr., Inc. v. Rio Blanco Cnty.*, 192 P.3d 501, 504 (Colo.App.2008) (county's determination of tax provision violation and imposition of administrative penalties reviewed under C.R.C.P. 106(a)(4)); *see also Butz*, 438 U.S. at 514, 98 S.Ct. 2894 ("Those who complain of error in [quasi-judicial] proceedings must seek agency or judicial review.").

### 5. Availability of the Defense

We also reject Churchill's suggestion that the defense of quasi-judicial immunity was not available in this case to "entities."

■ Citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), Churchill argues that quasi-judicial immunity is not available to persons who are sued in their official capacities. As *Kentucky v. Graham* points out, in official-capacity actions, persons who are acting under color of state law have the ability to claim the defense of sovereign immunity under the Eleventh Amendment to the United States Constitution. *Id.* Of course, *Kentucky v. Graham* does not suggest that an entity such as the University is not permitted to claim immunity under the Eleventh Amendment. Churchill ignores his own stipulation that as part of the trial process, the University would be entitled to claim the defense of

quasi-judicial immunity in exchange for dismissal of individuals and the ability of the University to assert any individual defenses the individuals could have asserted. Otherwise, he would be suing the University (which would seek immunity under the Eleventh Amendment), officials acting under color of state law (who could also claim such immunity), and persons in their individual capacities (who might claim quasi-judicial immunity if they were acting under color of state law).

### B. Churchill's Request for Equitable Relief

■ Churchill contends that quasi-judicial immunity does not apply to equitable remedies under 42 U.S.C. § 1983. Therefore, he argues that neither the University nor the Regents were immune from his request for reinstatement and front pay. We are not persuaded.

■ "Section 1983 creates no substantive rights, but rather creates only a remedy against those who, acting under color of law, violate rights secured by federal statutory or constitutional law." *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1243 (10th Cir.2000). Both judicial officers and quasi-judicial officers are absolutely immune from claims for monetary damages under section 1983. *See Pulliam v. Allen*, 466 U.S. 522, 540, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (judicial officers); *Horwitz v. State Bd. of Med. Exam'rs*, 822 F.2d 1508, 1515 (10th Cir.1987) (quasi-judicial officers).

In 1984, the Supreme Court held that judicial immunity was not a bar to equitable remedies such as claims for injunctive relief. *Pulliam*, 466 U.S. at 541–42, 104 S.Ct. 1970. However, in 1996, Congress amended section 1983 to bar injunctive relief "against a judicial officer for an act or omission taken in such officer's judicial capacity ... unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983; *see* Federal Courts Improvement Act of 1996, Pub.L. No. 104–317, § 309(c), 110 Stat. 3847 (1996).

Neither the Supreme Court nor the Tenth Circuit has yet addressed whether 42 U.S.C. § 1983 protects officials acting in a quasi-judicial capacity from claims for injunctive relief. Churchill urges us to narrowly construe the term "judicial officer" not to include quasi-judicial actors and cites *Simmons v. Fabian*, 743 N.W.2d 281 (Minn.Ct.App. 2007), in support. The *Simmons* court concluded that section 1983 immunity is sparingly granted and that nothing in the amended language or legislative history indicated that the immunity granted to "judicial officers" also extended to quasi-judicial officials. *Id.* at 290–94. Therefore, in *Simmons*, quasi-judicial actors were not immune from claims for injunctive relief under section 1983. *Id.* at 294.

■ It appears that *Simmons* has not been followed by any other court. We reject the reasoning in *Simmons* in part because it ignores *Butz*, 438 U.S. 478, 98 S.Ct. 2894, which held that judicial immunity extended to officials acting in a quasi-judicial capacity. *See Pelletier v. Rhode Island*, 2008 WL 5062162, at *6 (D.R.I. No. 07–186S, Nov. 26, 2008) (unpublished order). Instead, we choose to follow the great weight of authority that has concluded that the term "judicial officer" found in section 1983 extends to quasi-judicial actors—thereby barring claims for injunctive relief. *See Roth v. King*, 449 F.3d 1272, 1286–87 (D.C.Cir.2006); *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir.1999); *Gilmore v. Bostic*, 636 F.Supp.2d 496, 506 (S.D.W.Va.2009); *Pelletier*, 2008 WL 5062162, at *6.

Accordingly, we are unable to grant Churchill's request for prospective relief unless (1) the University violated a declaratory decree or (2) declaratory relief was unavailable. Churchill has not claimed that the University violated a declaratory decree, and so that option is unavailable. He is also unable to demonstrate that declaratory relief was unavailable.

■ Finally, Churchill's claim for reinstatement or front pay fell within the trial court's considerable discretion to fashion equitable remedies. *See Schreck v. T & C Sanderson Farms, Inc.*, 37 P.3d 510, 515 (Colo.App.2001) ("[t]rial court possesses broad discretion in fashioning an equitable remedy...."). We will not disturb such a ruling absent an abuse of discretion that is

manifestly arbitrary, unreasonable, or unfair. *La Plata Med. Ctr. Assocs., Ltd. v. United Bank*, 857 P.2d 410, 420 (Colo.1993). We perceive nothing about the trial court's denial of Churchill's claims that demonstrates such an abuse of discretion. *See id.*

Therefore, we perceive no error in the trial court's conclusion that quasi-judicial immunity barred Churchill's claims for reinstatement and front pay.[5]

### C. Adverse Employment Action

Churchill next argues that the trial court erred in entering a directed verdict on his 42 U.S.C. § 1983 First Amendment retaliation claim after finding that the University's investigation of him did not constitute an adverse employment action. We disagree.

### 1. Law

Our review of a trial court's ruling on a motion for directed verdict is de novo. *MDM Grp. Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 885 (Colo.App. 2007). A trial court may only grant such a motion where the evidence "compels the conclusion that reasonable persons could not be in disagreement and that no evidence, or legitimate inference arising therefrom, has been presented upon which a jury's verdict against the moving party could be sustained." *Flores v. Am. Pharm. Servs., Inc.*, 994 P.2d 455, 457 (Colo.App.1999). In evaluating the trial court's ruling, we consider the evidence in the light most favorable to the nonmoving party. *Id.*

### a. What Makes an Employment Action Adverse?

We begin by looking at the nature of an adverse employment action. In the absence of Colorado law on the subject, we turn our attention to a number of federal cases that have dealt with adverse employment actions. Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands. *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000). The action taken must be sufficiently punitive or involve a change in employment to a new position which is "markedly less prestigious and less interesting than the old one." *Id.*

Courts have concluded that investigations alone are not adverse employment actions. *Id. Breaux* concluded that an internal affairs investigation which the plaintiffs contended had been launched in bad faith and resulted in his transfer was not an adverse employment action. *Id.* at 158. The court reasoned that the plaintiffs failed to show that the alleged "campaign of retaliatory harassment" created an intolerable situation compelling the plaintiffs to transfer to less desirable positions. Also, reasonable persons in the plaintiffs' positions would not have felt compelled to resign. Because the plaintiffs still had their jobs and had not been demoted, the defendants' conduct did not amount to an adverse employment action.

Before an employment action can be considered adverse, it must materially alter the terms or conditions of employment. "[The plaintiff] has the burden of proving that the alleged employment action adversely and materially altered the terms or conditions of her employment." *Altonen v. City of Minneapolis*, 487 F.3d 554, 560 (8th Cir. 2007). The action must effect a material change in the terms or conditions of employment. *Bechtel v. City of Belton*, 250 F.3d 1157, 1162 (8th Cir.2001). Where one has the same pay and continues to work, the action is not adverse. *Id.*

Some other forms of less severe conduct by employers may also constitute an adverse employment action for First Amendment purposes. *See Brammer–Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1208 (10th Cir.2007) (providing poor performance ratings, forbidding teachers to speak to parents about school matters, and blacklisting teachers from future employment at the school could be actionable adverse employment action); *Schuler v. City of Boulder*, 189 F.3d 1304, 1310 (10th Cir.1999) (removing job duties, issuing written reprimand, giving poor performance evaluation, and transferring employee satisfy adverse employment action requirement).

**5.** We assume without deciding that in this context front pay is an equitable claim.

■ The Tenth Circuit Court of Appeals has "never ruled that *all* [of an employer's acts], no matter how trivial, are sufficient to support a retaliation claim." *Couch v. Bd. of Trs.*, 587 F.3d 1223, 1237 (10th Cir.2009) (quoting *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1340 (10th Cir.2000)). Further, "there may be some minor adverse actions that would not constitute First Amendment violations." *Lybrook*, 232 F.3d at 1340 (quoting *Colson v. Grohman*, 174 F.3d 498, 511 (5th Cir.1999)).

■ In addition, the United States Supreme Court has stated, "Context matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

Churchill's claim requires a determination that the investigation conducted under the auspices of the Regents was an adverse employment action. He claims that his First Amendment rights were violated because his exercise of free speech caused the investigation and argues that the investigation was retaliation for exercising his First Amendment rights.

b. Retaliatory Actions Against the Exercise of Free Speech as Adverse Employment Actions

■ Even though a claim is couched in terms of retaliation against free speech, an adverse employment action must be part of the proof. A First Amendment claim based on retaliation by an employer is analyzed under the test of *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), as modified by *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). *See Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301–02 (10th Cir.2009). The test is composed of five elements:

(1) whether the speech was made pursuant to an employee's official duties; (2)

whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon*, 553 F.3d at 1302.

■ This test cannot be applied in a vacuum. The essential first step in applying the test is to assume that the plaintiff has been the victim of an adverse employment action. The Tenth Circuit Court of Appeals has noted that "[i]mplicit in the [*Garcetti/*] *Pickering* test is a requirement that *the public employer have taken some adverse employment action against the employee.*" *Couch*, 587 F.3d at 1235–36 (emphasis added) (quoting *Belcher v. City of McAlester*, 324 F.3d 1203, 1207 n. 4 (10th Cir.2003)). The plaintiff bears the burden of establishing an adverse employment action and "causation—that is, that the constitutionally protected speech was a substantial motivating factor in the employer's decision to adversely alter the employee's conditions of employment." *Id.* at 1236 (quoting *Maestas v. Segura*, 416 F.3d 1182, 1188 & n. 5 (10th Cir.2005)).

2. Analysis

We perceive no error in the trial court's ruling because Churchill did not establish that the University's investigation constituted an adverse employment action.

Whether an investigation alone is sufficient to constitute an adverse employment action has not been resolved by the United States Supreme Court, and there does not appear to be a definitive consensus on the matter among federal courts.

■ It is important to note that the record reflects that at all times pertinent to the investigation, Churchill continued to be paid his normal pay and benefits and continued to hold his position as professor with tenure. Churchill taught classes and was permitted

to speak openly in public. In nearly all of the cases cited by Churchill that held adverse employment actions to be cognizable under 42 U.S.C. § 1983, the claims were not based solely upon a theory that the investigation itself was an adverse action. Instead, the claims involved other wrongful actions. *See Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir.2007) (administrative inquiry and transfer); *Coszalter v. City of Salem*, 320 F.3d 968, 976–77 (9th Cir.2003) (transfer of the plaintiff to new duties, unwarranted disciplinary investigation, unwarranted assignment of blame, reprimand containing a false accusation, and criminal investigation instituted in retaliation for exercise of First Amendment rights provided actionable grounds under 42 U.S.C. § 1983); *Allen v. Iranon*, 283 F.3d 1070, 1073–76 (9th Cir.2002) (prison doctor locked out from seeing patients, had multiple internal affairs investigations launched against him, and was passed over for promotions; the defendants did not dispute that those actions constituted adverse employment actions); *Ulrich v. City & Cnty. of S. F.*, 308 F.3d 968, 977 (9th Cir.2002) (investigation that threatened to revoke doctor's clinical privileges, refusal to rescind doctor's resignation, and filing adverse action report held adverse employment actions).

Churchill argues that *Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 171–72 (4th Cir.1996), supports the position that an investigation alone can constitute an adverse employment action. *Hetzel* is not helpful to Churchill. There, the court held that, of all the allegations raised by the plaintiff, "only the alleged failure to promote and [an internal affairs] investigation can even possibly constitute adverse retaliatory action." The court stated it had "significant doubts" whether the investigation could constitute an adverse employment action, but that it did not need to decide that issue. *Id.* at 172. Any suggestion that the case stands for the proposition that investigations alone may constitute adverse employment actions is not well taken.

Cases from the Tenth Circuit indicate that action more significant than investigation alone is necessary to constitute adverse employment action. In *Belcher*, 324 F.3d at

1207 n. 4, the court, stating that if an employer's action is "inconsequential or has only speculative consequences, there can be no basis for a First Amendment claim," held that a written reprimand threatening dismissal for further speech is sufficient to constitute an adverse employment action.

In *Couch*, a physician brought a section 1983 action against a hospital where he had staff privileges, alleging that there had been a campaign of retaliation as a result of his speaking out about substance abuse at the hospital. The court concluded that the investigation launched against the doctor did not constitute an adverse employment action. *Id.* at 1235–39; *see also Carrero v. Robinson*, 2007 WL 1655350, at *10 (D. Colo. 05cv-02414, June 5, 2007) (unpublished opinion and order) (finding internal affairs investigation was not an adverse employment action because it did not change the terms or conditions of employment); *Spagnuolo v. City of Longmont*, 2006 WL 2594484, at *1 (D.Colo. 05–cv–00729, Sept. 11, 2006) (unpublished order) (dismissing employee's claims where employer allegedly "instigated and conducted an unwarranted investigation of [the employee's] activities after [the employee] exercised his First Amendment free speech rights").

Other federal circuits that have concluded that an employer must be permitted to investigate the potential misconduct of its employee without the fear of the investigation being interpreted as an adverse employment action. *See Breaux*, 205 F.3d at 158 (concluding that investigating alleged violations of departmental policies and making purportedly false accusations are not adverse employment actions); *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir.1998) (subjecting an employee to internal affairs investigation and referring her for psychological testing did not constitute adverse employment action); *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir.1998) ("[I]n light of the employer's duty ... to make a reasonable investigation before imposing discipline on an employee for engaging in protected speech, it is clear that [the complaint] that defendants conducted an investigation is not a valid First Amendment claim."). Without this ability to investigate, a public employer would be left

without recourse and would lose its "greater leeway in its dealings with citizen employees." *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 599, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008).

▮ Churchill claims that the investigation chilled his right to free speech and that under those circumstances it constituted an adverse action. The standard is not whether his speech was chilled; it is whether the University's actions would "deter a reasonable person from exercising his ... First Amendment rights." *Couch,* 587 F.3d at 1238 (quoting *Brammer–Hoelter,* 492 F.3d at 1208); *see also Maestas,* 416 F.3d at 1188 n. 5 ("[W]e have never held employment action which may tend to chill free speech is necessarily adverse.").

The process adopted by the Regents provides for the control of academic standards and the investigation into tenured professors' compliance with those standards. Chancellor DiStefano and the University concluded that Churchill's 9/11 essay was protected speech. However, while the University was examining this question, nine separate allegations of Churchill's research misconduct came to light. At least two of these allegations, by Professor John LaVelle, predated the University's investigation.

The Board of Regents had charged the faculty, in cooperation with the administration, to develop the policies and procedures to prevent, identify, and respond to research misconduct. "Research misconduct" includes "fabrication, falsification, plagiarism, or other serious deviation from accepted practices in proposing, carrying out, or reporting results from research." University of Colorado Standing Committee on Research Misconduct, Research Misconduct Rules: Operating Rules and Procedures § 1, at 1. Under these rules and procedures, Chancellor DiStefano had an obligation to forward the allegations of Churchill's research misconduct to the SCRM. Following these rules and procedures, the SCRM was then responsible for investigating the allegations. The SCRM charged first the Inquiry Committee and then the Investigative Committee to look into the allegations. The SCRM then undertook its own review before concluding by a vote of

six to three that Churchill's research misconduct warranted dismissal. Churchill's academic freedom did not include the right to commit research misconduct that was specifically proscribed by the University's policies and enforced through a system of shared governance between the administration and the faculty.

The University's investigation of Churchill's research misconduct therefore did not constitute an adverse employment action for purposes of his First Amendment claim. *See Couch,* 587 F.3d at 1238.

▮ Nor are we able to conclude that the University's investigation became an adverse employment action because it had a chilling effect on Churchill's speech and the speech of some faculty members. Churchill contends that such a chilling effect was demonstrated by his own testimony of the emotional toll the investigation took on him and by Professor Saito's testimony that she was concerned about being investigated because of her support for Churchill. Again, the standard is whether a reasonable employee would be deterred from exercising his First Amendment rights because of the investigation. *Id.* at 1238. Neither of these examples shows that free speech was chilled, impeded, or stifled. After Chancellor DiStefano determined that Churchill's 9/11 essay was protected speech, the investigation focused upon allegations of research misconduct.

In extensive argument to the trial court, Churchill's counsel contended that motivation is the sine qua non of an adverse employment action. We are unaware of any case concluding that an investigation was adverse because of the motive of the investigators. Moreover, the record before us indicates that the investigation involved twenty-five faculty members, whose collective motive was not established.

We distinguish the current case from *Levin v. Harleston,* 966 F.2d 85 (2d Cir.1992), a case which Churchill claims provides particular guidance. In *Levin,* a tenured professor created controversy because of his views on race expressed in three writings. *Id.* at 87. The university created a "shadow class" for those students who wanted to transfer out of

his class. *Id.* at 87–88. The university president also created an ad hoc committee to determine whether the professor's views went beyond the protection of academic freedom and amounted to some form of misconduct. *Id.* at 89. The committee recommended that no disciplinary action be taken. *Id.* The court concluded that the president's actions "conveyed a chilling threat of discipline" that violated the professor's First Amendment rights. *Id.* at 89–90.

The present case is distinguishable. The *Levin* court did not specifically address the issue of whether the creation of the "shadow class" and the investigation constituted an adverse employment action under *Pickering*. Additionally, in contrast to the committee in *Levin*, each faculty member that served on the Investigative Committee, the SCRM, and the P & T Committee recommended that the University take some form of disciplinary action against Churchill for his research misconduct (with the majority of the three committees' members concluding that he should be dismissed).

■ We next reject Churchill's argument that the investigation caused damage to him. In this argument, he necessarily recognizes that an investigation must have some punishing or diminishing consequences before it can be deemed to be an adverse employment action. He states that the investigation caused him to miss deadlines and to default on unspecified book contracts. He also claims that third parties cancelled speaking engagements and the alumni association withheld an award from him. As to the former contentions, the record is devoid of any proof of damage or causation. As to the latter cancellations and the withholding of the award, the University did not take these actions and therefore they do not constitute an adverse employment action. *See, e.g., Robbins v. Oklahoma,* 519 F.3d 1242, 1251 (10th Cir.2008) ("In general, state actors may only be liable under section 1983 for their own acts, not the acts of third parties."). Nothing in the record before us establishes any damage in the form of pecuniary or professional loss to Churchill as a result of the investigation.

■ We disagree with Churchill's argument that the University committed an adverse employment action when it failed to process his sabbatical request. The only evidence of this action presented at trial was in his grievance submitted to the P & T Committee, which was admitted as an exhibit. Churchill has not cited any evidence in the record showing that he was entitled to a sabbatical under the terms of his employment or that any delay in the University's processing his request was not due to normal administrative procedures. *See* C.A.R. 28(a)(4) (appellant's "argument shall contain . . . [the] parts of the record relied on"); *Brighton Sch. Dist. 27J v. Transamerica Premier Ins. Co.,* 923 P.2d 328, 335 (Colo. App.1996) (appellate court has no duty to search the record), *aff'd,* 940 P.2d 348 (Colo. 1997). Nor does Churchill suggest that he planned to take his sabbatical during the course of the investigation or at any time before he was terminated.

■ Churchill further argues that the University committed an adverse employment action when it prevented him from "unbanking" courses. However, in neither the testimony presented at trial nor in his briefs does he explain the term "unbank." In fact, he presented no testimony at trial referencing the term "unbank." This term appears in his grievance submitted to the P & T Committee, which was an exhibit at trial, which alleges "[the University's] attempt to prevent [him] from 'unbanking' courses for which [he] was owed release time." Churchill presented no evidence by which a reasonable juror could conclude or make a legitimate inference that preventing him from "unbanking" his courses was an adverse employment action as distinguished from a routine aspect of academia. Neither he nor any other witness explained this term or how it may have adversely affected the conditions of his employment. *See Pastrana v. Hudock,* 140 P.3d 188, 189 (Colo.App.2006) ("[W]e will disregard statements of fact in either party's brief that are unsupported by the record . . . , and we will not search the record for evidence to support allegations of error.").

We also note that Churchill's contention supposes that the investigation and his termi-

nation are separate adverse actions. Of course, he is relegated to this position because quasi-judicial immunity shields the University and its Regents from liability for terminating him. At least one court has ruled that an employee must allege injury independent of termination for the investigation to constitute an independent claim. *Hoffman v. Baltimore Police Dep't,* 379 F.Supp.2d 778, 792–93 (D.Md.2005). On the contrary, Churchill claimed at trial that the very purpose of the investigation was to terminate him.

### D. Duplicative Claim

We also conclude that the trial court would have been justified in dismissing the adverse employment action claim because it was duplicative of the second claim for relief which alleged retaliation by termination. Both claims for relief alleged that the investigation was wrongful. As relevant here, both the first and second claims for relief, as set forth in the original complaint and in the trial management order, stated:

> The Defendants' acts of intimidating, threatening, and investigating Professor Churchill were motivated by Professor Churchill's exercise of constitutionally protected conduct. Defendants' actions caused Professor Churchill to suffer injuries that would chill a person of ordinary firmness from continuing to engage in such constitutionally protected activity.

The two claims for relief are identical in all respects, except that the words "and finally terminating" are added to the termination claim after the words "and investigating."

Although at oral argument Churchill's counsel contended that the two claims had been distinguished for the jury, our review of the record shows the contrary: Churchill asserted the investigation was a sham conducted to assure his termination, and that the termination was inextricably tied to the investigation.

There was no practical way for Churchill to prove that he was wrongfully terminated without presenting evidence intended to show that the investigation was flawed and began as a result of his exercise of First Amendment rights. By the same token, if we were to grant the relief sought by Churchill, namely a new trial solely on the wrongful investigation claim, he would necessarily present evidence that he was terminated, and that evidence would be part of the evidence the jury could consider in concluding whether the investigation was justified.

Because the first claim for relief based on the investigation was entirely subsumed within the second claim for relief for wrongful termination, the claims were duplicative, and the trial court correctly directed a verdict for the University on the first claim. *See Barham v. Scalia,* 928 P.2d 1381, 1387 (Colo.App.1996) (trial court correctly dismissed claim that was duplicative and superfluous); *cf. Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1264 (Colo.2000) (applying economic loss rule to prohibit duplicate claims under tort and contract theories); *Aller v. Law Office of Carole C. Schriefer, P.C.,* 140 P.3d 23, 27 (Colo.App.2005) (when legal malpractice claim and breach of fiduciary duty claim both arise from same material facts, breach of fiduciary duty claim should be dismissed as duplicative).

### IV. Conclusion

We affirm the trial court's finding that the University and the Regents had quasi-judicial immunity. We also affirm the trial court's directed verdict in favor of the University and the Regents on Churchill's 42 U.S.C. § 1983 claim because Churchill failed to prove that the University's investigation constituted an adverse employment action. The judgment is affirmed.

Judge TERRY and Judge BOORAS concur.